Barbara C. **RUFFINO**, Plaintiff,

v.

**STATE STREET BANK AND TRUST COMPANY**, David A. Spina, Kenneth D. Stuart, Thomas W. Johnson, Ira B. Gregerman, and Susan G. Rice, Defendants.

Civ. A. No. 93–10188–NG.

United States District Court,
D. Massachusetts.

Nov. 29, 1995.

Jessica Block, Kelly L. Wilkins, Peter M. Lefkowitz, Heidlage & Reece, Boston, MA, for Barbara C. Ruffino.

Robert B. Gordon, Richard P. Ward, Ropes & Gray, Boston, MA, for State Street Bank & Trust Co., Thomas W. Johnson, Ira B. Gregerman and Susan G. Rice.

John M. Kahn, Hill & Barlow, Boston, MA, for Kenneth D. Stuart.

## ORDER

GERTNER, District Judge.

Defendants have requested that this court dismiss the entirety of plaintiff's case against them.

Their request comes before me in three motions for summary judgment: Motion of Defendant Kenneth D. Stuart, filed September 30, 1994; Motion of Defendants David A. Spina, Thomas W. Johnson, Ira B. Gergerman and Susan G. Rice, filed September 29, 1994; and, Motion of Defendant State Street Bank and Trust Company, filed September 29, 1994.

For the reasons set forth in the accompanying Amended Memorandum and Decision, dated November 29, 1995, I conclude that defendants' motions for summary judgment shall be **ALLOWED IN PART AND DENIED IN PART.** As to each claim, I rule as follows:

1. With respect to plaintiff's claims of sexual harassment against all defendants, under M.G.L. c. 151B (Count I); M.G.L. c. 214, § 1C (Count II), M.G.L. c. 93, § 102 (Count IV) and 42 U.S.C. § 2000e et seq. (Count III), defendants' motions for summary judgment are **ALLOWED.** Accordingly, Count I is **DISMISSED IN PART,** Count II is **DISMISSED,** Count III is **DISMISSED IN PART,** and Count IV is **DISMISSED.**

2. With respect to plaintiff's retaliation claims, under M.G.L. c. 151B (Count I) and 42 U.S.C. § 2000e et seq. (Count III), I **DENY** summary judgment in favor of the defendants.

3. As to Count V, charging negligent infliction of emotional distress as against defendants State Street Bank, Spina, Stuart, Johnson and Rice, defendants' motions for summary judgment are **ALLOWED,** and Count V is accordingly **DISMISSED.**

4. As to Count VI (interference with contractual and/or advantageous relations), I **DENY** summary judgment as to claims against defendants Spina, Stuart, Johnson and Gregerman. However, defendant Rice's motion for summary judgment is **ALLOWED,** and Count VI against defendant Rice is accordingly **DISMISSED.**

5. With respect to Count VII for negligent supervision and retention against defendants State Street Bank, Spina and Johnson, defendants' motions for summary judgment are **ALLOWED,** and Count VII is accordingly **DISMISSED.**

6. Count VIII for intentional or reckless infliction of emotional distress against defendant Stuart, I **DENY** summary judgment.

7. As Count IX for wrongful termination against State Street Bank, defendant's motion for summary judgment is **ALLOWED,** and Count IX is accordingly **DISMISSED.**

8. As to Count X for the breach of the implied covenant of good faith and fair dealing against State Street Bank, I **ALLOW** defendant's motion for summary judgment. Accordingly, Count X is **DISMISSED.**

 **SO ORDERED.**

### AMENDED MEMORANDUM AND DECISION [1]

GERTNER, District Judge.

### I. INTRODUCTION

The plaintiff, Barbara Ruffino, worked as a corporate manager at State Street Bank and Trust. She alleges that, over a period of years, she was subjected to a sexually harassing and hostile work environment. She also charges that when she told supervisors about the discriminatory conditions, she confronted an indifference which turned to retaliation against her as she pressed her complaints.

This case raises some of the close questions of discrimination law: questions of fairness with respect to the filing requirements for plaintiffs who have sought redress within their workplace; questions of the relationship between statutes prohibiting employment discrimination and common law causes of action; and questions of the different language and forms of harassment and retaliation in different work settings.

In her complaint, Ruffino alleges that her employer, defendant State Street Bank and Trust Company ("State Street" or the

"Bank"), and certain Bank employees, defendants David Spina, Kenneth D. Stuart, Thomas W. Johnson, Ira B. Gregerman, and Susan G. Rice, violated the Massachusetts Anti–Discrimination Law, M.G.L. c. 151B (Count I) and Title VII of the Civil Rights Act of 1964 (Count III) by creating a sexually harassing and hostile work environment and then by retaliating against her.

Ruffino also alleges a host of state law violations: violation of Massachusetts General Law Chapter 214, § 1C (Count II); violation of Chapter 93, § 102 (Count IV); negligent infliction of emotional distress against defendants State Street Bank, Spina, Stuart, Johnson and Rice (Count V); interference with contractual and/or advantageous relations against defendants Spina, Stuart, Johnson, Gregerman, and Rice (Count VI); negligent supervision and retention against defendants State Street Bank, Spina and Johnson (Count VII); intentional or reckless infliction of emotional distress against defendant Stuart (Count VIII); wrongful termination against defendant State Street Bank (Count IX); and, breach of implied covenant of good faith and fair dealing against defendant State Street Bank (Count X).

On June 24, 1992, plaintiff filed an administrative charge with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunities Commission (EEOC). On January 19, 1993, she filed suit in the Massachusetts Superior Court. Defendants removed to federal court.

Defendants move for summary judgment. They challenge the adequacy of Ruffino's sexual harassment claims principally on statute of limitations grounds, arguing that the claims are time-barred. They also reject the contention that Ruffino was sexually harassed at State Street, or that her allegations were improperly handled. As to the retaliation claims, defendants flatly deny that State Street Bank or its agents retaliated against Ruffino. Finally, they contend that the panoply of state law claims brought by plaintiff are either statutorily barred or meritless.

---

1. This memorandum supercedes the memorandum, dated November 15, 1995, previously issued in this matter.

For reasons set forth below, defendants' motions for summary judgment shall be **GRANTED IN PART AND DENIED IN PART.**

Specifically, with respect to Ruffino's state and federal claims of sexual harassment, I **GRANT** summary judgment to the defendants on the ground that her claims are barred by the relevant limitations period; I further **GRANT** summary judgment to the defendants on plaintiff's state claims brought under M.G.L. c. 214, § 1C and M.G.L. c. 93, § 102. As to plaintiff's retaliation claims, however, I **DENY** summary judgment for the defendants, on the ground that plaintiff has presented sufficient evidence from which a jury could infer the existence of unlawful retaliation.

As to plaintiff's common law claims, I find as follows: Count V for negligent infliction of emotional distress is barred by the Workers' Compensation Act and shall be **dismissed;** Count VI for interference with contractual relations shall **not be dismissed** as to defendants Spina, Stuart, Johnson, and Gregerman, and shall be **dismissed** as to defendant Rice; Count VII for negligent supervision is barred by the Workers' Compensation Act and shall be **dismissed;** Count VIII for intentional or reckless infliction of emotional distress as to defendant Stuart shall **not be dismissed;** Count IX for wrongful termination shall be **dismissed;** Count X for the breach of the implied covenant of good faith and fair dealing shall be **dismissed,** as the cause of action is not cognizable on these facts.

## II. *PROCEDURAL STANDARD*

Discrimination cases are often bound up in the sort of factual inquiries best left to a jury. Through circumstantial evidence, parties seek to prove motive and intent, issues least suited for a determination on a motion for summary judgment.[2] *E.g., LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 840 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809, 575 N.E.2d 1107 (1991).

 Summary judgment is appropriate only when all the relevant pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995); *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 711–716, 575 N.E.2d 734 (1991); *Smith College v. Massachusetts Commission Against Discrimination,* 376 Mass. 221, 227, 380 N.E.2d 121 (1978). Where the moving party makes an initial showing that there exists no genuine issue of material fact, the non-moving party may not merely rely on bald allegations to avoid summary judgment.[3] *Byrd v. Ronayne,* 61 F.3d 1026, 1030 (1st Cir.1995); *Madsen v. Erwin,* 395 Mass. 715, 719, 481 N.E.2d 1160 (1985). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Barbour,* 63 F.3d at 36.[4]

---

**2.** While the summary judgment standard in employment cases is formally unchanged after passage of the Civil Rights Act of 1991, the legislative decision to permit jury trials in Title VII cases emphasizes that the jury—not the judge—serves as the final decision-maker regarding factual disputes and credibility determinations before the court.

**3.** As the First Circuit has noted, "Where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Goldman,* 985 F.2d at 1116.

**4.** In particular, where there is a failure of proof of an element essential to the party's case, there is no "genuine issue as to any material fact" within the meaning of the Rule, since such a complete failure "renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In the context of discrimination claims, where there is no direct evidence of discrimination,

## III. *FACTUAL BACKGROUND*

The facts are stated in the light most favorable to the plaintiff. In or about February of 1984, Barbara Ruffino was hired as a training officer by defendant State Street Bank and Trust Company. Less than two years after her initial hire, Ruffino became the Division Personnel Officer ("DPO") for Corporate Staff.[5]

Ruffino reported to David Spina, Executive Vice President of State Street Bank, who had oversight responsibility for the Corporate Staff and also for a separate Operations Division. In addition to her other duties, Ruffino was responsible for conducting special projects as requested by Spina. From August of 1989 onward, Ruffino also reported to Thomas Johnson, Senior Vice President who took on duties as Chief Administrative Aide to Spina. Ruffino also occasionally reported to Kenneth Stuart, Senior Vice President for the Bank's Human Resources Division.

In December of 1987, an incident took place which, according to Ruffino, affected her experience of her workplace and her sense that, because she was a woman, less authority and respect was afforded her by those to whom she reported. Richard Cabot, a Vice President for Benefits Administration in the Human Resources Division, recommended that the job title of an employee within his division be upgraded. Without consulting and seeking the approval of DPO Ruffino, as the procedure required, Cabot discussed the promotion directly with Stuart. Then, bypassing Ruffino, Stuart recom-

mended the action to Spina.[6] When Ruffino discovered that Stuart had intentionally circumvented her, she researched the proper chain of command and reported the incident to Spina. According to Ruffino, when Stuart learned of her report, he had two reactions: the first was to question her authority, and the second was to let her know that he would not quickly forget this incident.[7]

According to Ruffino, after this event, Stuart began to assert his power in a different way: He sexually harassed her. Much of his harassment occurred in private, during Ruffino's meetings alone with Stuart and in conversations out of the earshot of others. Stuart's comments were often laced with inappropriate and offensive sexual innuendo. For instance, upon finding out that Ruffino's husband had been ordained as a priest, Stuart repeatedly made unwelcome and lewd comments about Ruffino's sexual life, including asking her whether her husband now "did it with his collar on." *See* Ruffino Dep., Vol. I, 159–172. Stuart made such remarks during his private meetings with Ruffino, when he ran into her in the hallways of the Bank, and sometimes in the presence of others. Not all his statements, however, were directed at Ruffino personally. He also made inappropriate remarks to Ruffino about other women. For instance, during the Summer of 1989, an employee returning from maternity leave had asked Ruffino if she could have use of a spare room among the personnel offices; she needed a private place in which to use her breast pump, so that she could continue breast-feeding her newborn.

courts apply the "ritualized burden-shifting paradigm of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973)." *LeBlanc,* 6 F.3d at 842.

5. The Corporate Staff included the following Divisions: Legal, Auditing, Controllers, Marketing, Investor Relations, Community Affairs, Planning, Information Systems and Human Resources.

6. *Defendants do not dispute that this process was the norm.* They simply assert that the procedure—of which they are aware and which they outline in their Joint Memorandum of Undisputed Material Facts—was a "purported requirement." They further allege that Johnson evaded communication with Ruffino, because he was concerned about keeping the matter confidential

until it could be put into effect. Defendants assert that they had received reports that Ruffino had inappropriately disclosed confidential information in the past. Their allegations regarding breach of confidentiality are disputed by plaintiff.

7. In a sketch of prior incidents involving Stuart, prepared in October of 1991 for Johnson, Ruffino noted Stuart's reactions. Among other things, she wrote that Stuart confronted her angrily about her report, asking her pointedly: "What right do you have to do that (research compensation policy)?" *See* Complaint, Exh. B, at 2. He also, according to her report, stated that "from now on he would not trust me and ... I would be sorry for doing that and I'd better know that he was never going to forget it (the incident)." *Id.*

Ruffino approached Stuart with the employee's request. He agreed that she could use the room. Then he added: "She doesn't need the pump; I'll take care of her." *Id.* Ruffino was offended and stated so.

Within days of that 1989 incident, Ruffino met with Susan G. Rice, Manager of Employee Relations. Rice was the State Street employee designated to handle reports of harassment and discrimination. Ruffino spoke of this and other incidents; she asked for help.[8] Ruffino was particularly concerned about figuring out how to respond, given Stuart's position as Head of Personnel.[9] Rice seemed sympathetic. She acknowledged that she too had heard Stuart make inappropriate and derogatory comments; she recognized that they might well constitute sexual harassment. However she said that, because she reported to Stuart, she did not want to "get in the middle of it," or words to that effect. *See* Ruffino Dep., Vol. I, 88. No investigation ensued.[10]

After her meeting with Rice, Ruffino sought out Marge Dupere, a manager in the Employment Department. Dupere reported to Patrick Cunniff, the Manager of Employment. During her meeting with Dupere, Ruffino told her of the same incidents as well as of her meeting with Rice. According to Ruffino, Dupere told her to tolerate it; she said that there was nothing that could be done.

Plaintiff alleges that the discrimination continued. At least some of the conduct took place in meetings she was required to attend, namely, regular staff meetings held by Spina during the period from August of 1989 through March of 1991. On one occasion, before the group began its morning meeting, some of the attendees discussed the possible candidacy of a particular woman for governor. Stuart remarked that when she got PMS (Premenstrual Syndrome), she would not be able to handle the job.

On another occasion, in the Summer of 1990, Stuart stopped by Ruffino's office to discuss the hiring of a director for community affairs. Ruffino asked about women candidates. In talking about the only female external candidate, Stuart stated that he had reservations about her candidacy, because she had been married three times, stating something to the effect of: "Any woman that couldn't keep three men happy certainly wasn't somebody they were going to look for." *See* Ruffino Dep., Vol. III, 61–62. Ruffino was disturbed and reported the comment to another Bank employee, Robert Malley. She asked Malley to address Stuart's behavior. When, early in 1991, Ruffino followed up with Malley, she discovered that nothing had been done.

This was not the only comment Stuart made indicating that he keyed his assessment of women's job performance to his perception of their success in their private lives. For instance, sometime between 1988 and 1990, when Ruffino served as DPO, Ruffino attended a meeting with Stuart and another Bank manager. The three were discussing whether a particular State Street employee, a woman, would cooperate on a project. Stuart commented that the employee "didn't have a man now and you know what that does to her personality," or words to that effect. *See* Ruffino Dep., Vol. III, 21–23. In or about October of 1990, Ruffino sat through a staff meeting during which Stuart made

---

**8.** Among other things, Ruffino testified at deposition that she told Rice about Stuart's crude remarks as well as his response to a salary survey Ruffino had conducted which suggested that senior women at the Bank were "possibly being significantly underpaid as well as placed in lower level positions." *See* Ruffino Dep., Vol. I, 87. His comment to the survey was simply: "[T]hat's all they're worth." *Id.*

**9.** As Head of Personnel, Stuart was ultimately responsible for investigating, handling, and making findings with respect to complaints of discrimination or harassment.

**10.** Plaintiff notes that this is not only in contravention of state and federal law but also against the contractual rights guaranteed employees under their contract and the Sexual Harassment Policy incorporated therein. The Policy states in pertinent part, that: "All complaints or reports of sexual harassment will be investigated in confidence." *Sexual Harassment Policy*, State Street Bank and Trust Company Manager's Guide 62 (1991). *See* Complaint, Exh. A.

what she counted to be five or six disparaging remarks about women.[11]

Having complained once to Rice to no effect, in or about November of 1990, Ruffino turned to Johnson, because of his role as her supervisor and a Department Head and also because he was Stuart's good friend.[12] She explained to Johnson that Stuart's ongoing remarks were offensive to her and others, particularly because of his central role, as Division Head of Human Resources, in enforcing anti-discrimination policies. According to Ruffino, Johnson said that he himself had heard inappropriate comments and wondered about them. He promised to take the issue up with Stuart.

No immediate action was taken. In or about January of 1991, Ruffino was discussing a professional matter with Johnson in which she mentioned that she thought it was important that Johnson had a doctorate in the relevant field. As Ruffino recounts the incident, at that point, Stuart appeared and said that "this was just like" Johnson. Stuart explained, "Every time he gets around girls, he wants to play doctor. And we always have trouble with him on our golf trips." *See* Ruffino Dep., Vol. III, 36.

Finally, it appears, Johnson did talk with Stuart—during a golf game.[13] As Stuart recalled, the criticism was not seriously delivered. Indeed, Stuart noted that Johnson's tone and words were so casual that he thought Johnson was joking. *See* Johnson Dep., Vol. II, 142–144, Exh. 43. Notwithstanding, at deposition, Ruffino could not recall Stuart making any inappropriate com-

ments after Johnson spoke to Stuart or, in any case, after March of 1991.

In early 1991, while Stuart's conduct was ongoing, discussions about reorganizing her department surfaced. There was talk of the elimination of Ruffino's position. Johnson suggested to Ruffino that she transfer to the Systems Productivity and Analysis Department in Johnson's Information Systems Division ("ISD") and become the Productivity Analyst within that department. Johnson characterized the new position as a lateral move with excellent promotion opportunities. Ruffino's title at that time was that of Assistant Vice President. Based upon his explanation, Ruffino enthusiastically accepted the position.

However, Ruffino was not made aware of certain facts about the new job.[14] For instance, after her transfer, Ruffino was asked to work in a cubicle instead of a separate office. She was also informed, some time after the transfer, that she would be reporting to Ira Gregerman, Vice President and Manager of the Systems Productivity and Analysis Department, instead of reporting directly to Johnson. Ruffino also alleges that after a few months in her new position, she was removed from Johnson's division management team. Ruffino took this action to be part of a gradual demotion, effectively reducing her status and authority.

Notwithstanding her concerns, Ruffino met with Gregerman to set forth performance and professional development goals for the remainder of the 1991 calendar year, including monitoring the ongoing training and development program for ISD managers,

---

**11.** At her deposition, Ruffino recalled the outlines of these comments. They are the stuff of classic sex discrimination claims: disparaging remarks about the qualifications of women; comments insinuating that women should never have been allowed in the public sphere; and comments about sports metaphors and women's inability to grasp professional discussions couched in such language. *See* Ruffino Dep., Vol. I, 119–120.

**12.** Under State Street Bank's internal guidelines, when an employee goes to a bank manager, it is that manager's responsibility to initiate a complaint. The process then involves the Department Head, in this case Johnson. *See* Ruffino

Dep., Vol. I, 106. As to her decision, Ruffino said: "I also knew that Tom Johnson was a very good friend of Ken's, so I thought that he could handle it easier." *Id.*

**13.** The date of this discussion is unclear, although defendant Johnson admits that he mentioned the concerns to Stuart during a golf game, "some time after Ruffino's complaint," *see* Johnson Dep., Vol. I, 113–116.

**14.** According to plaintiff, the elimination of her former position was done in name only: the position was retitled with the functions remaining essentially the same and another employee given the job.

known as the ISD Management Development Program ("MDP"). As part of their discussions, Ruffino prepared a proposed training program. According to Ruffino, Gregerman never responded to it.[15]

In her new position, Ruffino continued to have occasional professional dealings with Stuart, during which, she alleges, he continued to harass her, until October of 1991. However, at deposition, Ruffino recalled only two incidents during which she had contact with Stuart after her transfer in March of 1991. The first occurred sometime during the summer and involved internal mailing addresses for a special project. She alleged no harassing conduct during that meeting. The second did not take place until the meetings set up to address her grievances, in October of 1991.

Indeed, on October 10, 1991, Ruffino approached Johnson to discuss the harassment "she had previously experienced." See Complaint, ¶ 30.[16] Ruffino explained to Johnson that the Congressional hearings held with respect to the allegations of sexual harassment by Professor Anita Hill against then Judge Clarence Thomas had motivated her to step forward again. During their conversation, Johnson said that he was aware of, and had heard, Stuart's frequent derogatory remarks and jokes about women. From Ruffino's observations, Johnson seemed to agree with her assessment of Stuart and with her impression that he harbored negative attitudes towards women.

Johnson asked Ruffino if Stuart's conduct had interfered with her work. She reported that it had. As an example, she noted that her ability to raise questions, in the course of her role as DPO, had been stifled by his actions. In addition to raising concerns about Stuart, Ruffino told Johnson that she believed that discrimination and sexual harassment pervaded the Bank's culture. She also made suggestions as to possible remedial measures the Bank could pursue,

including confronting Stuart in a formal setting and instructing him to cease his harassment.

A few days after their discussion, Johnson requested that Ruffino prepare a memorandum. He asked her to do so minutes before a meeting scheduled with Stuart and to limit her comments to a couple of incidents directly involving Stuart. She did. In a memorandum entitled "Notes for Tom Johnson Discussion with Ken Stuart on My Behalf," Ruffino stated, among other things, that she was complaining about Stuart's "derogatory comments about women and his sexual innuendos." She then listed two examples. The first related to the above-described incident in December of 1987 when Stuart circumvented her in the promotion process. In her brief narrative regarding that incident, Ruffino noted Stuart's discomfort with her role and independent authority. She did not allege that Stuart made any sexually-charged and offensive comments during their exchanges. The second example centered on the above-described request Ruffino had made on behalf of an employee who had just returned from maternity leave. In her notes for Johnson, Ruffino specifically referred to Stuart's offer to "take care" of the employee so that she would not need to use a breast pump.

Late in October of 1991, Johnson and Spina asked Ruffino to meet with Stuart and Rice separately. She expressed concern but was told that it was "this or nothing." If she met with both of these managers, Johnson and Spina promised that they would initiate a broader investigation, not only into the incidents about which Ruffino complained, but also into the existing procedures for handling complaints and possible programs for identifying sexual harassment and sex discrimination at the Bank. Based on their assurances, Ruffino agreed to meet with Stuart and Rice.

---

**15.** Defendants dispute this characterization and make much of their contention that Ruffino did not perform adequately in this area in explaining her 1991 performance review and her raise.

**16.** At deposition, when asked whether her complaint of Stuart's sexual harassment was "con-

fined to the period" when she was DPO, Ruffino said it was. She qualified her answer, stating it was true as to "sexual harassment on a personal basis, towards me directly." See Ruffino Dep., Vol. I, 60.

Initially, Ruffino conditioned her agreement to participate in the meetings on the presence of a neutral third party to mediate. Ruffino and Johnson came up with two names; Spina rejected both. Spina said he wanted to keep the discussions "inside" State Street. Johnson suggested that he could act as Ruffino's advocate. Reluctantly, Ruffino accepted this scenario.

At that time, Ruffino did not know that Stuart, Johnson and Spina together had discussed and structured the meetings. *See* Johnson Dep., Vol. II, Exh. 43, at Bates No. 0241. Nor did she know that it was Johnson's design to limit the scope of Ruffino's grievance and to dissuade Ruffino from pursuing her complaint of systemic hostile environment discrimination. Indeed, when Ruffino agreed to a grievance process only involving meetings with Rice and Stuart, Johnson apparently reported this result to Stuart, commenting that he had been able to get Ruffino "off that kick." *Id.* Furthermore, Ruffino did not know that prior to any investigation, all three men agreed that the problem was Ruffino herself. For instance, during a phone conference in which Stuart, Spina and Johnson participated, Stuart said that he thought the trouble was Ruffino; Spina concurred, calling Ruffino "zany, crazy, off her rocker," or words to that effect. *Id.* Surely, Ruffino was unaware when she agreed to the format and prepared for the meetings, that the night prior to the arranged meeting with Stuart, Spina called the Stuart at home to "commiserate;" that Spina reiterated his belief that the issue was Ruffino; and that he had called Ruffino a "whacko woman" or words to that effect. *Id.* As Stuart himself noted, he, too, wanted to make sure that Ruffino was perceived as "unbalanced," among other things. *Id.*

As might be expected given this backdrop, the meetings—however cordial—failed as remedial measures. No future corrective plans were discussed, nor was there any follow-up investigation. None of the actions requested by Ruffino (and promised by State Street's agents) was initiated.[17] Instead, Ruffino alleges, various Bank employees accelerated their attempts to demean her work and scuttle her attempts at continued success at State Street.

As support for this contention, Ruffino points to contrasts in the view of her work before the retaliation began and afterwards. For instance, in his monthly activity reports to Johnson during 1991, Gregerman had regularly described the Management Development Program activities, in which Ruffino was involved, in generally positive terms; his activity reports did not suggest the sorts of problems which were later attributed to Ruffino. In contrast, in or about December 1991 or January of 1992, according to Ruffino, Johnson met with Gregerman to inform the latter of specific concerns he wished noted in Ruffino's annual review. By February of 1992, Gregerman's view of Ruffino's work seemed to have changed.

Ruffino's 1991 annual review contained more critical information than had been in any prior review of her performance. Specifically, Ruffino discovered that Gregerman gave her an "N" rating, indicating "Does Not Meet Standards" on two performance standards, the first "N" rating(s) she ever received.[18] After the review, she was also granted a percentage raise at the bottom of her rating scale, 3.7%. This increase was in marked contrast to her raises in years past, and in contrast to the increases received by others within the same general rating category that year. After reading her evaluation, Ruffino prepared a detailed response, disput-

17. While Spina has suggested that he spoke with some female employees, he could remember no names, no specific comments, and no dates of the meetings. He apparently took no notes. *See* Spina Dep., Vol. II, 63–66.

18. Ruffino alleges that from 1984 to 1991, she received merit increases ranging from 5% to 12%, favorable reviews, and no substantive criticisms of her performance. Her reviews up to her 1991 evaluation tell of a uniformly successful performer who seems to have met the other professional challenges put in her path. Defendants have not identified a single notation in prior performance reviews indicating concern over a lack of stability in Ruffino's character or worries about her general demeanor and judgment, although these concerns became the focus of supervisors' private conversations and, at least in part, the focus of defendants' explanations for their subsequent actions.

ing the negative comments. Only after this reaction, in or about March or April of 1992, did State Street initiate an investigation into Ruffino's claims.

According to Ruffino, the investigation in the Spring of 1992 was perfunctory, at best. First, Spina placed Rice in charge, although it was Rice who had initially failed to take action on Ruffino's complaints. Second, Ruffino argues, the findings of the investigation were determined before any interviews took place. As evidence, Ruffino points to Rice's own notes, made before she interviewed any employees. The notes indicate her conclusions: no finding of sexual harassment, and troubles with Ruffino.

During that same time period, Bank supervisors began discrediting Ruffino's work, questioning her professional conduct and attendance on the job,[19] and addressing her sarcastically and unprofessionally. Ruffino alleges that their conduct was inconsistent with the respect accorded other managers who had not complained about discrimination.[20]

Ruffino took a disability leave on May 6, 1992. Upon the advice of her physician, she informed the Bank that she could not return to work as long as the conditions which led to her leaving existed. See Doyle Dep., 86. Dr. Doyle had concluded that conditions at the Bank had caused Ruffino stress based on a baseline analysis of her mental state and other factors.

Apparently, the Bank did not move to change conditions. A May 29, 1992 memo from Cynthia Graham to Rice noted: "Just follow-up with Ira [Gregerman], who had followed-up with Tom [Johnson]. Tom doesn't care if he ever hears from her [Ruffino] again (a widely held statement, I'm sure) ..." See Johnson Dep., Vol. III, 89, Exh. 61.

These events occurred in a work environment, Ruffino alleges, which was generally discriminatory and demeaning toward women. She outlines other incidents, alleging that the conduct of several State Street supervisors contributed to a work environment in which women's professional contributions were demeaned and in which sexually offensive language was to be expected and endured.[21]

19. Specifically, Ruffino alleges that Johnson began tracking her whereabouts in a way he did not track the whereabouts of similarly situated employees who had not complained of harassment. She pointed to a March 30, 1992 e-mail from Thomas Kelly, the Division Controller, to Johnson, regarding Ruffino's absence from work. See Johnson Dep., Vol. III, 78, Exh. 55. Kelly's documentation of Ruffino's whereabouts was particularly odd, given the fact that Kelly was Ruffino's peer and she did not report to him. At deposition, Johnson did not assert that Kelly had any formal role in supervising Ruffino. In explaining why Kelly would be passing on such information, he offered only: "At some point I did indicate to Tom I thought there was an attendance problem with Barbara, and I believe he was trying to be helpful." Id.

20. For instance, in or about January of 1992, Ruffino describes a classic situation which she believes was intended to intimidate her. Ruffino received notice of a meeting, set up by Gregerman, in which she believed, as would have been normal practice in such a meeting, Gregerman was going to give updates on a project which Ruffino managed but which Gregerman oversaw. Instead, when she arrived, she was faced with an unusual situations: three vice presidents, in addition to Gregerman, who asked her accusing questions about the project and her progress.

The meeting was hostile and the vice presidents' comments sarcastic, according to Ruffino. See Ruffino Dep., Vol. I, 66–68.

21. Ruffino recounts a number of incidents to support this allegation. For instance, she alleges that during the mid 1980's, Marty Ironstone, a manager, repeatedly told sexually explicit and offensive jokes "about women or women's breasts, male genitalia." See Ruffino Dep. I, 144–149; see also Ruffino Dep. V, 99–100. Apparently another State Street supervisor, Patrick Cunniff, "felt free to comment on the secretary's sexual activity." Id.

Ruffino further alleges that women's personal appearances were often elevated above objective criteria in determining their worth. For instance, in 1989, Ruffino alleges that the Employee Employment Officer was having trouble because she was supposed to hire a secretary for one of the executives, Charles Kelly. Kelly had asked her to interview a woman who apparently had impressed him when he met her at a health club. The woman had no secretarial skills. When Stuart found out about the situation, he did not seem bothered. He said: "[I]t doesn't make a difference. All he's ever looked for is a good body. He doesn't care if they can type anyway." See Ruffino Dep., Vol. III, 30. When Ruffino and the Employment Officer balked at the thought of hiring someone without the neces-

Effective October 1, 1992, Ruffino resigned from her position at State Street Bank.

## IV. DISCUSSION

### A. Sexual Harassment Claims

#### 1. Title VII and Chapter 151B

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of sex, with respect to the terms, conditions or privileges of employment. 42 U.S.C. § 2000e–2(a)(1). The legislation, both generally and particularly in the area of employment, is ambitious and broad in purpose. *See, e.g.,* H.R. No. 914, Civil Rights Act of 1964, U.S.CODE CONG. & ADMIN.NEWS, 88th Cong., 2nd Sess., 1964, pp. 2355, 2393 ("The purpose of this title is to eliminate ... discrimination in employment");[22] *EEOC v. Shell Oil Co.,* 466 U.S. 54, 69–70, 104 S.Ct. 1621, 1631, 80 L.Ed.2d 41 (1984) ("By 1972, Congress was aware that employment discrimination was a 'complex and pervasive' problem that could be extirpated only with thoroughgoing remedies ...");[23] *Harris v. Forklift Sys.,* —— U.S. ——, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993) (reaffirming Title VII's "broad rule of workplace equality").

It is well settled that in order to eradicate discrimination in the workplace, harassment based on gender must be prohibited. *E.g.,* 29 C.F.R. § 1604.11 (1991) (setting out EEOC Guidelines for sexual harassment);[24] *Harris v. Forklift Sys.,* —— U.S. at ——, 114 S.Ct. at 370 (confirming that Title VII makes hostile environment sexual harassment actionable); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (adopting EEOC Guidelines and affirming that sexual harassment shall be considered a form of workplace sex

---

sary job qualifications, Stuart pressed the point, saying that "if he wants a good body and no typing skills, then give it to him." *See* Ruffino Dep., Vol. III, 31. The Bank hired the woman, despite the fact that Ruffino had reported the conversation not only to Stuart, but also to Cunniff. This was not the first time this had happened. In 1985 or 1986, according to Ruffino, Marty Ragosa, a Division Comptroller reporting to Spina, instructed Ruffino to recruit a receptionist who "was very attractive and had big boobs," or words to that effect. *See* Ruffino Dep. Vol. II, 5–8. Also, in 1987 or 1988, Ruffino was asked by Spina to meet with another female employee to tell her that Spina wanted her to dress "more like a woman." *See* Ruffino Dep., Vol. III, 73. Among other things, Spina said that he wanted the employee to wear more stylish dresses and high heels. Ruffino objected and explained her concerns to Spina. *See* Ruffino Dep., Vol. III, 78–79. Ruffino, at deposition, noted several other such comments and incidents; many, however, were reported to her by others at the Bank, and as to others, she could not ascertain when they took place.

22. House Report No. 914 stated: "Considerable progress has been made in eliminating discrimination in many areas because of local initiative ... Nevertheless ... it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. That need is evidenced, on the one hand, by a growing impatience by the victims of discrimination with its continuance and, on the other hand, by a growing recognition on the part of all of our people of the incompatibility of such discrimination with our ideals and the principles to which this country is dedicated." U.S.CODE CONG. & ADMIN.NEWS 1964 at 2393.

The Federal Circuit recently noted: "The purpose of Title VII is not to import into the workplace the prejudices of the community, but through law to liberate the workplace from the demeaning influence of discrimination, and thereby to implement the goals of human dignity and economic equality in employment." *King v. Hillen,* 21 F.3d 1572, 1582 (Fed.Cir.1994).

23. The Court in *Shell Oil* quoted 1971 Congressional reports stating: "Unrelenting broad-scale action against patterns or practices of discrimination" are essential to the achievement of the purposes of Title VII. The 1971 hearings clarified that the Title VII granted the EEOC power to investigate patterns and practices of discrimination. *Id.,* citing H.R.Rep. No. 92–238, pp. 8, 14 (1971); *see also* S.Rep. No. 92–415, p. 5 (1971), U.S.CODE CONG. & ADMIN.NEWS, pp. 2137, 2149.

24. The EEOC Guidelines state that sexual harassment involves the following:

Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature ... when such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.

29 C.F.R. § 1604.11 (1991).

discrimination); *see also Lipsett v. University of Puerto Rico*, 864 F.2d 881, 899 (1st Cir.1988).

■ A claim for sexual harassment will lie where the offensive conduct is based on the employee's sex, is unwelcome and is sufficiently severe or pervasive to interfere with the employee's job performance or to create an abusive work environment. *Harris v. Forklift*, —— U.S. at ——, 114 S.Ct. at 370. Where a specific quid pro quo is not alleged, a plaintiff may make out a claim for "hostile environment" sexual harassment, if the complained of conduct is sufficiently pervasive or severe to "alter the terms and conditions of the victim's employment and create an abusive working conditions." *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405; *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 782 (1st Cir. 1990).[25]

The state law is certainly no less ambitious, no less clear regarding sexual harassment and no less committed to broad remedial measures.[26] *See College–Town Div. of Interco v. Massachusetts Comm'n Against*

*Discrimination*, 400 Mass. 156, 160, 508 N.E.2d 587 (1987).[27] The inquiry required by *College–Town* centers on whether a defendant's conduct "created a barrier, based solely on gender, to [a plaintiff's] full and untrammelled participation in the workplace. General Laws c. 151B, § 4, was intended to removed these discriminatory barriers." *College–Town*, 400 Mass. at 162, 508 N.E.2d 587.

■ Plaintiff has argued that defendants' conduct amounted to hostile environment discrimination: personally directed, unwelcome and sexually offensive comments, derogatory remarks about women generally, the casual devaluing of women's professional performance, an inappropriate and unwelcome focus on plaintiff's sexual life and the private lives of other women at the Bank. However, given the timing of the allegations, the first question—and ultimately the dispositive one—is whether the claims of sexual harassment are barred by the statute of limitations for discrimination actions brought under state or federal law.[28]

---

**25.** Whether the conduct alleged meets that standard is to be determined based on the totality of the circumstances. *Harris v. Forklift Sys.*, —— U.S. at ——, 114 S.Ct. at 371; *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 945 (1st Cir. 1995); *see also Brown v. Hot, Sexy and Safer Productions*, 68 F.3d 525, 539–40 & n. 13 (1st Cir.1995); 29 C.F.R. § 1604.11.

**26.** It is interesting to recall that an early form of the Massachusetts Anti–Discrimination Law, enacted in 1946, prefigured its federal equivalent by some eighteen years. *See* St.1946, c. 368, § 4.

**27.** In 1986, the same year the Supreme Court announced its decision in *Meritor*, the Massachusetts Legislature specifically defined both quid pro quo and hostile environment sexual harassment, defining such sexual harassment as sex discrimination prohibited under M.G.L. c. 151B, § 4(1). St.1986, c. 588, § 2. *See* M.G.L. c. 151B, § 1(18)(a) & (b).

**28.** Defendants advance other theories in support of their motions for summary judgment, many of which are grounded in the faulty notion that conduct which was not directed at the plaintiff, as well as conduct which is not specifically sexual in nature, may not be evidence of hostile environment sexual harassment. These propositions are simply wrong as a matter of law and common sense.

The pervasive use of insulting and demeaning terms relative to women in general may serve as

evidence of a hostile environment. *See, e.g., King v. Hillen*, 21 F.3d 1572, 1581 (Fed.Cir.1994); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990). In *King v. Hillen*, the Federal Circuit overruled an administrative agency's determination that in order to make out a hostile environment claim the plaintiff must be complaining of conduct "of a sexual nature." *Id.* at 1583. The *King* court stated: "Conduct that is based on the sex of the victim, whether or not the conduct is 'of a sexual nature,' is appropriately considered in determining whether an abusive or hostile environment has been created.... Offensive behavior when based on the sex of the employee is discriminatory and, when sufficiently severe or pervasive to constitute an abusive or hostile work environment, violates Title VII and the EEOC Regulations." *Id.; see also Hall v. Gus Construction Co.*, 842 F.2d 1010, 1014 (8th Cir.1988); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1503 (11th Cir.1985).

Sex stereotyping may also provide evidence of hostile environment sexual harassment. *E.g., Jenson v. Eveleth Taconite Co.*, 824 F.Supp. 847, 880–881 (D.Minn.1993). The *Jenson* Court credited the testimony of an expert in sex stereotyping and explained its relevance to a hostile environment claim in the following way: After adopting a definition of sex stereotyping, as "a thought process whereby people apply various personality attributes and characteristics that they have in mind concerning an identifiable group, e.g., women, to specific individuals who are members

### a. *Statute of Limitations: Legal Standards*

Defendants make several points regarding plaintiff's allegations of harassment. They argue that the comments did not meet either the federal or state standards for hostile environment; they contend that she sat on her rights by not complaining earlier; and they state that no matter what the merits of plaintiff's case, Ruffino's sexual harassment claims, under both Title VII and Chapter 151B, are time-barred. Ruffino responds that her sexual harassment claims were timely filed and that, even if they were not, the court should exercise its equitable powers to save her claims.

I agree with defendants. Ruffino has failed to provide specific facts within the appropriate limitations period sufficient to avoid summary judgment on her state and federal claims of sexual harassment. Further, I find that this is not a case in which the filing period should be equitably modified. Therefore, I grant summary judgment as to the sexual harassment claims which comprise part of Counts I and III of plaintiff's complaint.

Title VII and Chapter 151B require that plaintiffs file charges of discrimination within

a fairly narrow limitations period. 42 U.S.C. § 2000e–5(e), M.G.L. c. 151B, § 5.[29] As the First Circuit has explained, the basic purpose behind a short filing period is to provide "the government an opportunity to conciliate while the complaint is fresh and [to give] ... early notice to the employer of possible litigation." *Kale v. Combined Ins. Co. of America*, 861 F.2d 746, 753 (1st Cir.1988) (discussing statute of limitations in ADEA cases).

■ However, it has long been recognized that these strictures must be interpreted broadly to give effect to the state and federal laws' broad remedial purposes. *See, e.g., Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 392–98, 102 S.Ct. 1127, 1131–35, 71 L.Ed.2d 234 (1982) (filing requirements under Title VII are not jurisdictional and are to be "interpreted broadly to effectuate the broad remedial intent of Congress to eliminate discrimination.").

■ Particularly, under continuing violations theory, where a plaintiff alleges an ongoing course of discrimination, a charge may encompass unlawful conduct outside of the limitations period, as long as at least one incident of unlawful conduct occurred within the requisite period.[30] *See, e.g., Meritor*, 477

29. 42 U.S.C. 2000e–5(e) requires that plaintiffs file a charge with the Equal Employment Opportunities Commission ("EEOC") within 300 days of complained of act of discrimination in a deferral state such as Massachusetts; M.G.L. c. 151B, § 5, requires that plaintiffs file state charges within six months of the alleged act of discrimination.

30. Two types of continuing violations have been recognized in this Circuit: systemic violations and serial violations. *See generally Jensen v. Frank*, 912 F.2d 517, 522–23 (1st Cir.1990). A systemic violation "need not involve an identifiable, discrete act of discrimination transpiring within the limitations period.... [It] has its roots in a discriminatory policy or practice; so long as the policy itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint." *Id.* at 523. A serial violation, in contrast, "is composed of a number of discriminatory acts emanating from the same animus, each act constituting a separate wrong actionable under Title VII .... In other words, a serial violation is 'continuing' by virtue of the fact that it keeps happening." *Id.* at 522.

Ruffino has not alleged any systemic violation or any discriminatory policy. I shall therefore

of that group....," the court concurred that where sex stereotyping created a " 'sexual spill-over,' " that is, "the idea that 'the sexual dimension that characterizes male-female relationships outside of a work environment spills over ... into the work environment, and ... becomes part of the working environment,' " *id.* at 881, it creates a sexualized work environment. Therefore, under certain circumstances, such stereotyping may be evidence of hostile environment sexual harassment. The Eighth Circuit has also noted, "Sexual harassment can take place in many different ways. A female worker need not be propositioned, touched offensively, or harassed by sexual innuendo.... 'Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances.' " *Burns v. McGregor Electronic Industries, Inc.*, 989 F.2d 959, 964 (8th Cir.1992) (quoting *Hall*, 842 F.2d at 1014).

Indeed, when a complaint arises out of conduct of upper management in a corporate work environment, where innuendo, stereotyping and dismissive remarks may have replaced more glaring symbols of sex discrimination, the law's recognition of this evidence is particularly important.

U.S. at 60–61, 106 S.Ct. at 2402–03;[31] *Kassaye v. Bryant College,* 999 F.2d 603, 606 (1st Cir.1993); *Lynn Teachers Union, Local 1037, AFT, AFL–CIO v. Massachusetts Commission Against Discrimination,* 406 Mass. 515, 519–520, 549 N.E.2d 97 (1990); 804 Code Mass.Regs. § 1.03(2).

 Under federal law, the central inquiry is whether a present, independent violation exists within the limitations period. *E.g., Muniz–Cabrero v. Ruiz,* 23 F.3d 607, 610 (1st Cir.1994). As this Circuit has stated, the "mere effects or consequences of past discrimination, as opposed to independently actionable violations ... are insufficient to serve as the trigger of the limitations period." *Kassaye,* 999 F.2d at 606.[32]

To be sure, the distinction between a violation with a present life and one with merely a present impact is often obscure.[33]

The difficulty in distinguishing after effects from continuing discrimination is especially acute when hostile environment sexual harassment is alleged, because this cause of action need not rely on acts which, standing alone, would support a claim of discrimination. Indeed, hostile environment discrimination typically is not confined to one act, directed at one individual, one time; rather, it is a composite of workplace action and inaction. As one court has commented, "[w]hen there are multiple incidents and victims, it is the cumulative effect of the offensive behavior that creates the working environment." *King v. Hillen,* 21 F.3d 1572, 1581 (Fed.Cir.1994).[34]

consider the requirements necessary to make out a serial violation under continuing violations theory.

**31.** This approach was implicitly adopted in *Meritor,* where the Court's findings where based on acts of harassment which had occurred over a four year period.

**32.** State law has articulated continuing violations theory differently. Massachusetts has codified continuing violations theory. Pursuant to state regulations, the six month limitation period will not be applied where "the unlawful conduct complained of is of a continuing nature." 804 Code Mass.Regs. § 1.03(2). In *Lynn Teachers,* the Massachusetts courts applied this regulation and apparently set a course distinct from the federal courts regarding continuing violations theory. The court recalled the basic purpose underlying continuing violations theory: to permit the courts and the Massachusetts Commission Against Discrimination "to remedy ongoing discriminatory policies." *Rock v. Massachusetts Comm'n Against Discrimination,* 384 Mass. 198, 207, 424 N.E.2d 244 (1981), and held, in a case involving a systemic violation, that current discriminatory effects which "spring directly" from a prior discriminatory act or policy, may be subject to the continuing violations rule. *Id.* at 522, 549 N.E.2d 97. The court noted that where the entity allegedly responsible for the ongoing discriminatory policy fails to rectify the effects of past discrimination, that entity breathes "new life" into the past actions and policies. *Id.* However, the scope of the *Lynn Teachers* rule is an open question. It might well be that *Lynn Teachers* applies most strictly to allegations of systemic, not serial, violations.

**33.** A comparison between state and federal court analyses of the same issue is instructive. Both the Supreme Court and the SJC have considered whether the continuing application of a seniority

system which relies on discriminatory criteria (established outside of a relevant limitations period) creates a continuing violation or merely the continuing effects of past discrimination. The Supreme Court held that the ongoing discriminatory impact of seniority systems, rooted in an initial discriminatory practice, is shielded from challenge, and that the continuing violations doctrine did not alter that result. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). The SJC disagreed, finding that a union's failure to credit the complainants with their preresignation seniority under the system's requirement of consecutive years of service gave present effect to past discriminatory policies. Accordingly, the court applied a continuing violations theory; the past discriminatory practice was not insulated from review by a narrow statute of limitations. *Lynn Teachers,* 406 Mass. at 521–522, 549 N.E.2d 97. In distinguishing its holding from the Supreme Court's holding in *Evans,* the SJC simply noted: *"Evans* considered a charge of a continuing violation brought under Title VII of the Civil Rights Act of 1964, involving the allegedly discriminatory application of a seniority system to an employee who had been forced to resign because of her marriage.... While this court may consider analogous Federal statutes for the purposes of interpretation, we 'are not bound by interpretations of the Federal statute in construing our own State statute'.... Because we view the *Evans* decision as unduly restrictive of an administrative agency's ability to punish discriminatory acts, ... we decline to follow its reasoning regarding continuing violations." *Id.* at 521 n. 7, 549 N.E.2d 97.

**34.** Notwithstanding defendants' assertions, the conduct to be considered as comprising hostile environment discrimination need not all have been directed personally at the plaintiff. As a

■ Accordingly, when a plaintiff's hostile environment claim is challenged on a statute of limitations ground, specific incidents within the statutory period cannot be examined in isolation.[35] Instead, such evidence must be considered in light of other factual allegations extending outside of the filing period. These discriminatory acts, taken together, must be examined to determine whether their cumulative effect created a hostile work environment for the plaintiff, during the relevant limitations period.

### b. *Statute of Limitations Application*

■ Has Ruffino alleged specific conduct, during the limitations period, sufficient to support her claim for hostile environment sexual harassment?

Flatly, she has not. Ruffino concedes that when she complained of Stuart's harassment in October of 1991 (an act within the limitations period), she referred to defendant Stuart's misconduct while she served as DPO, that is, until about March of 1991. And although Ruffino alleges generally that Stuart continued to harass her until October of 1991, when specifically asked at deposition, she could cite to no offensive, humiliating or demeaning conduct on his part following her departure from her job as DPO.

Furthermore, plaintiff could not specify others' conduct during this time—apart from the failure of her supervisors to address her earlier claims of sexual harassment—which was offensive, or demeaning to women such that it might have contributed to the hostile environment she alleges was created outside of the limitations period.

Plaintiff seems aware of this essential gap and tries to finesse it in her pleadings. It will not work. Mere allegations of "ongoing" harassment until October of 1991 are insufficient. Under a hostile environment theory, while misconduct alleged within the filing period need not provide an independent cause of action, there must be more than the legacy of suspicion and on-going ill feeling on the part of the plaintiff from past acts for her to jump the hurdle set up by the limitations period.

Plaintiff suggests an alternative theory to support her continuing violation theory of hostile environment discrimination. She contends that defendants' failure to investigate contributed to the hostile environment in she was compelled to work.

■ Theoretically, a failure to investigate claims of sexual harassment may be evidence of a hostile environment and may continue the substantive violation of a plaintiff's rights to work free of sexual harassment. *See, e.g., Maturo v. National Graphics, Inc.,* 722 F.Supp. 916 (D.Conn.1989); *cf. Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986) (where the employer had reason to know· that an employee was being harassed because of his race and the employer did nothing to prevent the harassment, that employer may be held liable under 42 U.S.C. § 1981, if it is determined that the harassment was not merely an "isolated slur" but rather a "campaign of harassment.").

In *Maturo,* plaintiff brought suit against employer and her immediate supervisor under Title VII for damages allegedly arising from her constructive discharge from her job. The *Maturo* court found that the defendant's failure to respond to plaintiff's repeated complaints led to an escalation of the harassment and ultimately to intolerable work conditions. The court held that where an employer failed to take reasonable, corrective measures to eliminate a supervisor's

---

matter of settled law and common sense, a hostile environment claim requires consideration of the environment in which a plaintiff works. In *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987), the Tenth Circuit explained: "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere ... as well as evidence of specific hostility directed toward the plaintiff—is [sic] an important factor in evaluating the claim." *Id.*

**35.** The *King* Court noted: "Indeed in the·usual case an isolated offensive incident does not create an abusive or intimidating environment. However, by viewing each incident in isolation, as if nothing else had occurred, a realistic picture of the work environment ... [may not be] presented. The frequency of the offensive conduct as well as its nature and its pervasiveness are all factors to be weighed in determining the abusiveness of the environment." *King,* 21 F.3d at 1581.

sexual harassment, that employer was liable not only under a theory of vicarious liability for the misconduct of the supervisor but also in its own right for failing to take steps to correct the situation. *Id.* at 922.

This case is not *Maturo.* Ruffino does not—and apparently cannot—allege that the blind eye turned by her employer permitted any continuing or escalating harassment, within the limitations period.[36] However ineptly done, her supervisor's discussion with Stuart, along with her own efforts, apparently put an end to his offensive conduct. Additionally, Ruffino has not alleged with any specificity that others' misconduct, which contributed to a hostile, offensive and abusive work environment, continued into the limitations period.

Ruffino also claims that the retaliation she experienced contributed to the sexually harassing and hostile environment. To be sure, where a plaintiff claims hostile environment discrimination and retaliation the two causes of action are often factually and legally intertwined.[37] However, retaliation is a distinct cause of action, motivated, at least in part, by a distinct intent to punish or to rid a workplace of someone who complains of unlawful practices. Unless specific facts suggest oth-

erwise, the simple factual and legal intersection between an underlying claim of discrimination and retaliation is insufficient to revive an otherwise stale claim.[38] On the facts presented here, continuing violations theory cannot rescue Ruffino's sexual harassment claims.

### c. Equitable Estoppel and Tolling: Standards

■ The limitations periods of Title VII and Chapter 151B are not jurisdictional but rather are subject to equitable tolling, waiver and estoppel. *See Zipes*, 455 U.S. at 392–398, 102 S.Ct. at 1131–35; *Christo v. Edward G. Boyle Ins. Agency*, 402 Mass. 815, 525 N.E.2d 643 (1988). Courts have recognized two distinct, though related, doctrines which may be used to modify the length of the relevant filing period: equitable estoppel and equitable tolling. Both doctrines have their roots in a single notion: Where a defendant has engaged in inequitable conduct, effectively preventing a plaintiff from filing a charge of discrimination, that defendant should not be permitted to "escape liability" because of his or her own misdeeds. *See, e.g., Kale v. Combined Ins. Co. of America*, 861 F.2d 746, 752 (1st Cir.1988).[39]

---

**36.** This statement may not be true of earlier efforts to complain of harassment; however, as to those claims, the statute of limitations presents a bar to their litigation.

**37.** As a matter of law, state and federal legislatures have recognized that retaliation must be prohibited as part of any broad remedial scheme intending to eradicate discrimination from the workplace. As a practical matter, the relationship works in two directions: Retaliation may result from an employee's assertion of his or her rights and his or her efforts to remedy a wrong quietly accepted in the workplace; or, sexual harassment itself may be a form of retaliation against women who take on traditionally male job functions and challenging traditionally-male authority.

**38.** I must note that this conclusion does not suggest that evidence of a pattern of harassment and of hostile environment discrimination is irrelevant to a valid claim of retaliation. Indeed, the opposite is true. *See, e.g., Glass v. Philadelphia Electric Co.*, 34 F.3d 188 (3d Cir.1994); *Hawkins v. Hennepin Technical Center*, 900 F.2d 153 (8th Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). In *Hawkins*, the Eighth Circuit considered a case in which the plaintiff alleged retaliation following internal

complaint of gender-based discrimination. The reviewing court held that the trial court abused its discretion in excluding evidence of litigation between the employer's former students and the employer over allegations of sexual harassment. *Id.* at 155–156. The court reasoned that, "[a]n atmosphere of condoned sexual harassment in a workplace increases the likelihood of retaliation for complaints [of sexual harassment] in individual cases." *Id.* at 155. The court stated that, because such evidence of pattern and practice may also evince a discriminatory intent, it should be "freely admitted at trial." *Id.* at 156.

**39.** The First Circuit has recognized has the broad purpose underlying anti-discrimination laws favors allowing courts in equity to modify a filing period where appropriate. *See Kale*, 861 F.2d at 751–752. However, this Circuit has also suggested that courts use their equitable powers sparingly when considering statutes of limitations in discrimination cases. *See, e.g., Mack v. Great Atlantic and Pacific Tea Co., Inc.*, 871 F.2d 179, 185 (1st Cir.1989) ("We hew to a 'narrow view' of equitable exceptions to Title VII limitations periods; an exception for concealment is 'appropriate only where the employer actively misled the employee....' This approach, we believe, mirrors the weight of authority.")

Under the theory of equitable estoppel, where a plaintiff reasonably relies on an employer's misleading representations and evidence of the employer's improper purpose is demonstrated, plaintiff is entitled to equitable relief and a modification of the limitations period. *Id.*

Under the doctrine of equitable tolling, where a plaintiff is not on notice that he or she should assert his or her legal rights and where commencing an action would not unduly prejudice the defendant, a court may modify the filing period. However, not all circumstances in which a plaintiff's inaction is the result of a defendant's (even harsh) actions will call for tolling. For instance, in *Kale*, the court rejected a plaintiff's request for modification of the limitations period where that plaintiff had spent a year "reeling from the blow" of being fired after twenty years on the job and thus did not file a technically timely administrative charge.

In arriving at its conclusion, the *Kale* court outlined some factors which weigh in favor of tolling the statutory period: (1) reasonable absence of the plaintiff's actual or constructive notice of discrimination; (2) the plaintiff's diligence in pursuing her or his rights; and (3) absence of prejudice to the defendant(s). The court specifically noted that the list is not exhaustive, for "it is in the nature of equity to entertain case-specific factors that may counsel in favor of tolling." *Id.* at 753 n. 9. *See also Conroy v. Boston Edison Co.*, 758 F.Supp. 54, 60 (D.Mass. 1991).

The standards are articulated slightly differently under state law. State courts have held that where a defendant "encourages or cajoles the potential plaintiff into inaction, that conduct may be a basis of extending the limitations period as [a] matter of equity." *Cherella v. Phoenix Technolo-*

*gies, Ltd.*, 32 Mass.App.Ct. 919, 920, 586 N.E.2d 29 (1992), citing with approval, *Christo*, 402 Mass. at 817–819, 525 N.E.2d 643.

### d. *Equitable Modification: Application*

Turning to the case at bar, Ruffino asks this court to apply the doctrine of equitable tolling and to modify the limitations period to permit litigation of her sexual harassment claims. Ruffino argues that her employer's promises of investigation and remediation prevented her both from knowing that her grievances were not being dealt with in a serious manner and from asserting her rights; that she diligently asserted her rights when she became aware that there was no investigation, and that tolling will not result in further prejudice to the defendants.[40]

While her argument is not wholly without merit, on the facts in this case, it falls short. Unlike an employee who did not have notice of discriminatory action, Ruffino knew full well that defendants' conduct might give rise to a valid complaint of gender discrimination and hostile environment sexual harassment. Her repeated complaints are evidence of such awareness. Her request for equitable modification, then, turns on the question of whether, as Ruffino argues, State Street's promises of investigation somehow misled her such that she reasonably put off filing charges.

On the facts alleged by Ruffino, this argument cannot be sustained.[41] Ruffino alleges repeated and patterned harassment. She alleges repeated, unheeded, complaints and stonewalling by supervisors at the Bank. Assuming her allegations true, she has undercut her own case. Clearly she was not only on notice of her legal rights and of the allegedly discriminatory conduct; she was also on notice, as early as her first meeting

**40.** Plaintiff has requested that this court equitably modify the filing period under the doctrine of equitable tolling. However, her argument, based on her belief that her employer affirmatively misled her, actually presents a case for equitable estoppel. On these facts, neither analysis yields the result desired by plaintiff.

**41.** Had Ruffino endured an incident—or incidents of discrimination—and gone immediately

to file an internal grievance, been intentionally misled into believing that a meaningful internal process was ongoing, and that remediation was forthcoming, the facts could have supported her request that the court equitably toll the limitations period. In this case, according to Ruffino's own testimony at deposition and her pleadings, however, inaction was predictable; perfunctory responses were to be expected.

with Rice, and undoubtedly by the time she met with Johnson, that the Bank's response was, at best, perfunctory. On these facts, it was thus unreasonable for her to rely on their alleged representations.

While it is certainly understandable that an employee would hope against hope for internal redress of her grievances, at some point her decision to rely on a recalcitrant workplace grievance process bars litigation of her claims in court. Ruffino has passed that point. Although the court may exercise its authority in equity to modify a filing period, it should not do so in a case such as this, where the plaintiff was well aware of her risks, and where permitting the claims to proceed would result in the defendants' being called upon to defend against allegations of actions long past.[42]

### 2. *M.G.L. c. 214, § 1C*

■ Plaintiff also claims that defendants' conduct violated M.G.L. c. 214, § 1C, which grants all persons the right to be free from sexual harassment, as that term is defined in M.G.L. c. 151B. The statute provides that "[t]he superior court shall have jurisdiction in equity to enforce this right . . . and to award damages." M.G.L. c. 214, § 1C.

Defendants contend that the Massachusetts Supreme Judicial Court's reasoning in *Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 631 N.E.2d 555 (1994) forecloses the possibility that a plaintiff may seek redress independently under M.G.L. c. 214, § 1C. In *Charland*, the SJC confronted the question of whether M.G.L. c. 93, § 102 (the Equal Rights Act), provided a cause of action for employment discrimination independent of M.G.L. c. 151B. The court examined the comprehensive remedial scheme for workplace discrimination set forth in Chapter 151B. The court reasoned that a law enacted after M.G.L. c. 151B, such as M.G.L. c. 93, § 102, could not possibly have been intended

to establish a "parallel and competing alternative to dealing with the problem of employment discrimination." *Id.* at 584, 631 N.E.2d 555. Accordingly, the SJC held that where M.G.L. c. 151B is applicable, it "provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." *Id.* at 586, 631 N.E.2d 555.

In *Clarke v. Kentucky Fried Chicken*, 57 F.3d 21 (1st Cir.1995), the First Circuit considered whether *Charland* required that actions brought under M.G.L. c. 214, § 1C similarly be barred. Although M.G.L. c. 214, § 1C was also enacted after M.G.L. c. 151B, the First Circuit found that *Charland* was not directly controlling because of the unique history of M.G.L. c. 214, § 1C, and that M.G.L. 151B does not exclude the possibility of a workplace sexual harassment claim brought under M.G.L. c. 214, § 1C. However, on its own analysis of the legislative history, as it exists, the court determined that the Massachusetts Legislature intended that Chapter 214, § 1C be available to discrimination plaintiffs only when Chapter 151B's administrative prerequisites had been followed, but the claim had not been adjudicated. The court reasoned: "Section 1C serves an essential function—by vesting in the superior court (as distinguished from the SJC, for example) exclusive original jurisdiction to entertain such administratively exhausted—but unadjudicated—sexual harassment claims." *Clarke*, 57 F.3d at 24–26; *see also Johnson v. Plastic Packaging, Inc.*, 892 F.Supp. 25, 31 (D.Mass.1995).

I must add, however, that the reasoning in *Clarke* goes directly against the weight of state law decisions on this matter. *E.g.*, *Burman v. Boch Oldsmobile, Inc. et. al.*, Civ. No. 92–2690, 3 MASS.L.RPTR. 441 (Norfolk Super.Ct., May 15, 1995); *Sobotka v. Westfield Savings Bank*, Civil No. 93–332, 2 MASS.

---

**42.** As the Massachusetts Supreme Judicial Court has stated: "Limiting the duration of liability is a well recognized public purpose. 'There comes a time when [a defendant] ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations, and he ought not to be called on to resist a claim "when evidence has been lost, memories have faded, and witnesses have disappeared." ' " *Klein v.*

*Catalano*, 386 Mass. 701, 709, 437 N.E.2d 514 (1982) (quoting, *Rosenberg v. North Bergen*, 61 N.J. 190, 201, 293 A.2d 662 (1972) (quoting, Developments in the Law: Statutes of Limitations, 63 Harv.L.Rev. 1177, 1185 (1950); *see also Jensen*, 912 F.2d at 522 ("Employers as well as employees are entitled to procedural safeguards in the precincts patrolled by Title VII").

L.Rᴘᴛʀ. 193 (Hampden Super.Ct., April 21, 1994); *Henry v. New England Telephone and Telegraph Co.*, Civil No. 92–4192 (Suffolk Super.Ct. May 5, 1993). In *Sobotka v. Westfield Savings Bank*, Civil No. 93–333 (Hampden Sup.Ct., January 3, 1995), decided well after the district court decision in *Clarke v. Kentucky Fried Chicken, Inc.*, C.A. No. 94–11101–EFH (D.Mass. August 17, 1994), a state superior court examined the intersection between M.G.L. c. 151B and M.G.L. c. 214, § 1C. The court concluded that: "The express language of [c. 214, § 1C] . . . grants to sexual harassment victims direct access to the Superior Court apart from the procedures of c. 151B." *Id.*, Slip Op., at 6; *accord* Heins, Massachusetts Civil Rights Laws, Mᴀss.L.Rᴇv. (Spring 1991), at 34.

This reading of the law is consistent with the plain meaning of the statute, its legislative history, as well as its particular placement in the General Laws.

As to the legislative history, the statute was enacted during the same legislative year and as part of the same package in which the Legislature specifically defined sexual harassment under the state's Anti–Discrimination Law, M.G.L. c. 151B. *See* St.1986, §§ 2 & 6; M.G.L. c. 151B, § 1(18); M.G.L. c. 214, § 1C. The Legislature was undoubtedly aware that it was giving strength and direction to sexual harassment law under Chapter 151B; it was also well aware that Chapter 151B generally grants plaintiffs the right to have their claims heard in superior court, after filing with the MCAD, and that Chapter 151B also permits the superior court to grant equitable relief. Notwithstanding, the Legislature created another remedy, sounding in equity and within the superior court's original jurisdiction. While that statute borrowed the definition of harassment

from Chapter 151B, it declined to borrow the procedural prerequisites. It strains credulity to believe that the Legislature self-consciously set out to create redundant law.

The distinct nature of Section 214 is underscored by its placement in the chapter of the General Laws providing for jurisdiction in equity. Generally, M.G.L. c. 214, § 1 confers equitable jurisdiction on the supreme judicial court and superior court. M.G.L. c. 214, § 1 enumerates two specific equitable causes of action, a right to privacy, M.G.L. c. 214, § 1B, and after 1986, a right to be free of sexual harassment, M.G.L. c. 214, § 1C. Others are enumerated in other sections of Chapter 214. It is not for the courts to second-guess the legislative determination that these named wrongs deserve specific, statutory, equitable remedies.[43]

Notwithstanding, the First Circuit's holding in *Clarke* necessarily dictates the result in this court. The claims under M.G.L. c. 214 § 1C are dismissed.

### 3. *M.G.L. c. 93, § 102*

Plaintiff also claims redress under the Massachusetts Equal Rights Act, M.G.L. c. 93, § 102. Defendants contend that this claim is barred because Chapter 151B provides the exclusive remedy for claims of discrimination in the making of employment contracts. *See Charland v. Muzi Motors*, 417 Mass. 580, 631 N.E.2d 555 (1994); *Agin v. Federal White Cement, Inc.*, 417 Mass. 669, 632 N.E.2d 1197 (1994). As noted above, in *Charland*, the SJC considered this issue and held that where M.G.L. 151B is applicable, M.G.L. c. 93, § 102 claims are barred. *Id.* at 584, 631 N.E.2d 555. Accordingly, defendants' motion for summary judgment as to Count IV is granted.

**43.** There is one final point worth noting: On the facts before me, were a court to permit a Chapter 214, § 1C claim, the victory might be pyrrhic. The claim might be time-barred. Generally, where actions are brought in equity under Chapter 214, the law borrows the limitations period for actions from the appropriate remedy at law. In privacy actions, for instance, the court borrows from tort and imposes a three-year limitation period. Here, a court in equity might well borrow from Chapter 151B and impose a six month statute of limitations. There are, however-

er, other possibilities: A court might, as federal courts do when considering the federal Civil Rights Act, 42 U.S.C. § 1981, borrow the limitation period governing personal injury. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Marsman v. Western Electric Co.*, 719 F.Supp. 1128, 1133 (D.Mass. 1988); or a court might rule, pursuant to M.G.L. c. 260, § 5B, that M.G.L. c. 214, § 1C shall be governed by the three-year limitations period provided for state civil rights claims.

## B. *Retaliation Claims*

Both state and federal law prohibit retaliation against employees who oppose employment practices which they believe to be unlawfully discriminatory. *See* 42 U.S.C. § 2000e–3(a); M.G,L. c. 151B, § 4(4); *see also Mesnick v. General Electric Co.*, 950 F.2d 816, 827 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992).

### 1. *Title VII*

#### a. *Standards*

■ Under Title VII, the *McDonnell Douglas* burden-shifting scheme governs a court's assessment of whether an employer may be found liable for adverse actions taken against an employee allegedly in retaliation for that employee's engaging in protected activity. The three-staged analysis ultimately requires a plaintiff to demonstrate, by a preponderance of the evidence, that a rational factfinder could conclude that the adverse action was taken for retaliatory reasons. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *see also Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 1094 n. 8, 67 L.Ed.2d 207 (1981); *St. Mary v. Hicks*, — U.S. —, —, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993); *Hazel v. U.S. Postmaster General*, 7 F.3d 1, 3 (1st Cir.1993); *Petitti v. New England Telephone and Telegraph Co.*, 909 F.2d 28, 32 (1st Cir.1990).

■ First, the plaintiff must make out a prima facie case of retaliation,[44] demonstrating that: (1) he or she engaged in a protected activity, known to the employer; (2) he or she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment actions. *Hazel*, 7 F.3d at 4; *Ramos v. Roche Products, Inc.*, 936 F.2d 43, 48 (1st Cir.1991), *cert. denied, Rossy v. Roche Products, Inc.*, 502 U.S. 941, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991); *Petitti*, 909 F.2d at 33.

■ It is well established that where an employee complains of alleged sexual harassment and sex discrimination under Title VII and he or she reasonably believes his or her allegations to have some foundation, that employee has satisfied the first element of the prima facie case. *Holland v. Jefferson National Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir.1989) (where complainant reasonably believes that employer's conduct is discriminatory, a report of sexual harassment is a protected activity under Title VII); *Morgan v. Mass. General Hosp.*, 712 F.Supp. 242 (D.Mass.1989), *aff'd in part and vacated in part on other grounds*, 901 F.2d 186 (1st Cir.1990) (since Title VII protects against sexual harassment, an employee.is protected against retaliation for opposing such activities); *accord Hazel*, 7 F.3d at 3–4.

■ As to the second element of the prima facie case, an adverse employment action does not need to amount to a discharge, although, "[n]ot all actions taken by an employer ... constitute 'adverse employment decisions.'" *Hurley–Bardige v. Brown*, 900 F.Supp. 567, 572 (D.Mass.1995). Generally, a plaintiff must demonstrate that he or she was denied a term, condition or privilege of employment. *Connell v. Bank of Boston*, 924 F.2d 1169, 1179 (1st Cir.), *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991); *see also Petitti*, 909 F.2d at 33 (where an employment action "disadvantages" persons engaging in protected activity, this element is made out).

■ The third element requires a plaintiff to demonstrate a causal connection between the alleged adverse action and her or his protected activity. At this stage, an inference of retaliation may arise where "[a] showing of [adverse action] ... soon after the employee engages in protected activity specifically protected by section 704(a) of Title VII ... is indirect proof of a causal connection between the [adverse action] ... and the activity because it is strongly suggestive of retaliation." *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 110 (1st Cir.1988); *see also Mesnick*, 950 F.2d at 828 (where there is a "long period of delay" between the

---

**44.** The First Circuit has described this initial stage as placing a "relatively light burden" on the plaintiff. *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir.1995).

protected activity and adverse action, an inference of retaliation may be negated); *accord Petitti,* 909 F.2d at 33 (the third element of the prima facie case is made out where there is a showing that "retaliatory motive play[ed] a part in the adverse employment actions.").

▐▐▐ Once established, that prima facie case gives rise to a rebuttable presumption of retaliation. In order to rebut that presumption, the employer must come forward with evidence of non-discriminatory reasons for the adverse action. The employer's burden is not onerous; the employer must come forward with competent evidence which, if taken as true, would permit a rational fact-finder to conclude that there was a "non-discriminatory reason" for the challenged employment action. *Woodman v. Haemonetics Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995) (citing *Hicks,* —— U.S. at ——, 113 S.Ct. at 2748).[45]

▐▐▐ Finally, where the defendant has met its burden of production, the plaintiff must proffer "sufficient admissible evidence, if believed, to prove by a preponderance of the evidence each essential element in a prima facie case and that the employer's justification for the challenged employment action was merely a pretext for impermissible ... discrimination." *Id.* In a retaliation case, the plaintiff must prove by a preponderance of the evidence that the articulated reason, in significant measure, was a pretext for retaliation. *Byrd,* 61 F.3d at 1032; *Mesnick,* 950

F.2d at 827. This ultimate determination of the employer's motive presents a "pure question of fact." *Hazel,* 7 F.3d at 4.

### b. *The Case at Bar*

In the case at bar, Ruffino has met her initial burden under federal law.

▐▐▐ As to the first element of her prima facie case, Ruffino's complaints of sexual harassment and sex discrimination are precisely the kind intended for protection from retaliation under Title VII. Except as to Gregerman, it is undisputed that the defendants knew of her complaints. With respect to Gregerman, he was aware—at minimum—of the fact of her complaints, if not of all their details.

▐▐▐ As to the second element, Ruffino alleges at least two phases of retaliatory conduct: first, she alleges that she suffered a demotion and a loss of status when she transferred from her post as DPO over to ISD; second, she contends that, after formally complaining of sexual harassment in October of 1991, she became the target of unfair ridicule, monitoring and criticism, and that she received an unwarranted and unfair performance review in February of 1992, as well as a retaliatory pay adjustment. While plaintiff also argues that these retaliatory conditions were so onerous that she was compelled to resign, she need not reach for a constructive discharge theory to make out her prima facie case.[46] I find that she has

---

**45.** To satisfy the burden of production, the employer's reason must be "clear and reasonably specific," *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, and supported by specific facts that would justify a judgment for the employer. *Id.* at 255 n. 9, 101 S.Ct. at 1094 n. 9.

Clearly, if the defendant wholly fails to produce competent evidence such that a rational fact-finder could conclude that there was a nondiscriminatory reason for the challenged action, the presumption will not be disturbed. *See, e.g., Hicks,* —— U.S. at ——, 113 S.Ct. at 2749. ("Where the elements of a sufficient prima facie case combine with the factfinder's belief that the ostensible basis for dismissing the employee was pretextual, 'particularly if ... accompanied by a suspicion of mendacity,' the factfinder is permitted to infer the intentional ... discrimination required to enable the plaintiff-employee to prevail on the merits.") This Circuit has interpreted

*Hicks* to mean that, " 'some cases exist where a prima facie case and the disbelief of a pretext could provide a strong enough inference of actual discrimination to permit the factfinder to find for the plaintiff. Conversely, we do not think that the Supreme Court meant to say that such a finding would always be permissible.... The strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances. In short, everything depends on the individual facts.' " *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995) (citations omitted).

**46.** As to her argument that defendant's actions amounted to a constructive discharge, "It is well settled in this Circuit that to establish a claim of constructive discharge, the evidence must support a finding that ' "the new working conditions has

met her burden of producing specific evidence which, if credited at trial, would tend to show that she was denied a term or condition of employment. Upon her first complaint to Johnson, she was moved from her job and slowly stripped of her authority. After issuing another, more formal, complaint, she became the target of ridicule by top management. Circumstances surrounding her review and pay increase are, at minimum, disputed. If Ruffino's version of events is credited, the inference may be drawn that others in State Street's management team had decided that since she was "off her rocker," they would simply push her out.

As to the third requirement, the causal connection, where direct evidence is missing, temporal proximity may provide the necessary nexus. Here, the adverse actions taken against Ruffino, if her allegations are credited, escalated sharply during and immediately following Ruffino's decision to press her complaints. I find this temporal connection sufficient to raise an inference of retaliatory motive.[47]

In response to the plaintiff's prima facie case, defendants must come forward with legitimate non-discriminatory reasons for the adverse actions taken. In this case, defendants try to simplify the picture and focus primarily on the fact of her contested evaluation. Their argument boils down to the following: that since Ruffino never personally made any allegations of sexual harassment against Gregerman, the manager who signed her performance evaluation, or against Johnson, neither of these men had reason to retaliate against Ruffino; and that Ruffino's performance evaluation was wholly warranted, even generous. Regarding her pay raise, they assert that she fell within the lower range of her the ratings scale, and thus received a low-range merit raise.[48]

Defendants have produced credible evidence of non-discriminatory reasons for some

---

would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." ' " *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 27 (1st Cir.1995). When examining the reasonableness of a resignation, courts have often looked at whether the new conditions impose a situation that the plaintiff would reasonably find humiliating and demeaning. *See, e.g., Greenberg*, 48 F.3d at 27 (court notes absence of assertion that new conditions would be demeaning or humiliating in determining that constructive discharge standard had not been met); *Aviles–Martinez v. Monroig*, 963 F.2d 2, 6 (1st Cir.1992) (where evidence included near daily scolding and mocking of plaintiff in front of clients, court held that there was sufficient evidence to find constructive discharge).

Courts are instructed to examine the totality of the circumstances in assessing whether a claim based on a constructive discharge theory will lie. The First Circuit has noted: "Appellant's theory is that since each isolated incident cannot as a matter of law suffice for a constructive discharge, all of them together must also fail to do so. The fallacy in this 'divide and conquer' approach is that these events must be viewed as part of a single behavior pattern by appellants." *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986).

47. Defendants unsuccessfully attempt to challenge the adequacy of plaintiff's prima facie case. They make two principal arguments: First, they contend that she suffered no adverse action, since she voluntarily resigned and was not constructively discharged. Second, they allege that Gregerman was unaware of the substance of her complaints (a fact which Ruffino contests, since she told him herself). As to the first point, they do not successfully dispose of the factual disputes from which a jury could infer that Ruffino was disadvantaged or denied a term or condition of employment; they simply assert that she was not constructively discharged. As to the second, taking the evidence in the light most favorable to Ruffino, this argument strikes this court as somewhat disingenuous. Defendant Gregerman admits to knowing generally about the complaint and to discussing Ruffino with Johnson. While defendants argue that Gregerman was not influenced by Johnson, this contention begs credulity, if for no other reason than that Johnson was Gregerman's direct supervisor.

48. Defendants also argue that Ruffino's 1991 evaluation and subsequent pay adjustment cannot be compared to her prior evaluations in order to determine whether the results were unique and perhaps retaliatory. They state: "Whatever her previous evaluations may have been, Ruffino was working for a new supervisor in an entirely new position or responsibility." This fact, surely, cannot in and of itself erase the relevance of past estimations of Ruffino's performance. Were that the case, employers wishing, impermissibly, to rid themselves of employees who complain of discriminatory conditions, would simply transfer them before papering a file. Such conduct cannot be endorsed by the courts. Rules regarding relevance cannot be so narrowly construed as to undermine the purpose of Title VII's and Chapter 151B's prohibitions against retaliation.

of their actions. They suggest that Ruffino's job performance was not as solid in her new position as it had been in prior jobs; they show that her pay raise was not abnormally low, as compared against others at the low end of her range.[49]

The burden now shifts to Ruffino to prove that defendants' reasons are pretextual and to persuade a jury on the ultimate issue of retaliatory motive. As to this burden, Ruffino has produced enough information to survive summary judgment. While a jury could credit the proffered reasons of defendants for their actions, they could also credit Ruffino's evidence. For instance, the allegation that the language used to describe Ruffino as "whacko," "off-her-rocker," and "unbalanced," surfaces for the first time after Ruffino complains of discrimination and directly in connection with discussions about how to handle her concerns, the unprecedented criticism of her work, the "helpful" monitoring of her whereabouts by non-supervisory co-workers, the changes in Gregerman's assessments of the projects on which she was working: these facts could lead a reasonable jury to conclude that retaliation motivated the defendants' conduct. Defendants dispute these inferences. It is precisely this sort of material, factual disagreement which precludes summary judgment as to Ruffino's claim of retaliation in violation of Title VII.

### 2. *Chapter 151B*

The same result is compelled under Chapter 151B, § 4(4), which makes it unlawful for an employer to discriminate because the employee opposed practices forbidden by the law.[50]

### 3. *Personal Liability*

Ruffino has alleged retaliation in violation of Title VII and M.G.L. 151B not only against State Street Bank as her employer but also against defendants Spina, Stuart, Johnson, Gregerman, and Rice as individuals. The individual defendants urge the actions against them be dismissed, arguing that neither Title VII nor Chapter 151B contemplates personal liability for workplace discrimination.

Title VII generally prohibits employers from engaging in discrimination in the workplace. It defines "employer," as "a person engaged in an industry ... and any agent of such person." 42 U.S.C. § 2000e(b). The central question is whether individual agents of an employer may be personally liable for Title VII violations. Courts have split on the answer. Some have construed the inclusion of the phrase "and any agent" merely to express and emphasize the settled notion that employing entities, through the doctrine of respondeat superior, may be liable for the actions of their supervisory employees. For instance, the Ninth Circuit has held that the "agent" language in Title VII's definition of employer forecloses the possibility that an agent could also be liable in his or her individual capacity. *Miller v. Maxwell's Int'l,* 991 F.2d 583 (9th Cir.1993), *cert. denied, Miller v. LaRosa,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994).

I am unpersuaded by the Ninth Circuit's logic. Its reading of Title VII reduces Section 2000e(b)'s inclusion of the term "agents" under the definition of "employer" to verbal surplusage. This result is disfavored as a matter of statutory construction[51] and merit-

---

49. Defendants have been silent in their briefs as to their collective discussions prior to the October 1991 meetings with Ruffino, their decision to label her "whacko" and words to that effect, and other incidents which Ruffino contests were part of the retaliation she faced.

50. In *Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 646 N.E.2d 111 (1995), the SJC distinguished state court burdens of proof in discrimination cases, holding that a plaintiff may prevail under state discrimination law by showing that her or his employer's reasons for the adverse action complained of are pretextual. Following *Blare,* courts in this district have differentiated between *Blare*'s stan-

dards and those set out in federal case law. *Staffier v. Sandoz Pharmaceuticals Corp.,* 888 F.Supp. 287, 291 (D.Mass.1995) (Gorton, J.); *McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals,* 880 F.Supp. 900, 905 n. 2 (D.Mass.1995) (Stearns, J.). Whatever the differences between federal and state law, they are not relevant to the outcome of this case.

51. As the First Circuit has noted, "Courts should not lightly read entire clauses out of statutes, but should, to the exact contrary, attempt to give meaning to each word and phrase." *United States v. Flores,* 968 F.2d 1366, 1371 (1st Cir. 1992).

less as a matter of stated policy. Most simply, it denies the plain meaning of Section 2000e(b): that both employers, as entities, and their agents, as individuals, are to be bound by Title VII's dictates.[52]

This clear meaning has not escaped many courts confronting the question of individual liability under Title VII. *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178 (6th Cir.1992); *Paroline v. Unisys Corp.*, 879 F.2d 100, 104 (4th Cir.1989); *Owens v. Rush*, 636 F.2d 283, 286 (10th Cir.1980); *Goodstein v. Bombardier Capital, Inc.*, 889 F.Supp. 760, 764 (D.Vt.1995); *Douglas v. Coca–Cola Bottling Co. of Northern New England, Inc.*, 855 F.Supp. 518, 520–521 (D.N.H.1994); *Lamirande v. Resolution Trust Corp.*, 834 F.Supp. 526 (D.N.H.1993); *cf. Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931, 951–952 (1st Cir. 1995).[53]

Under M.G.L. c. 151B, the question is unambiguous. Chapter 151B sets out the following as an unlawful employment practice:

> For an employer, by himself or his agent, because of . . . sex . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation, or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.

M.G.L. c. 151B, § 4(1). Section 4(1) applies this general prohibition to each employer, acting by and through its principal and its agents.

Other provisions of Section 4 state that individuals, *qua* individuals, and not merely *qua* employer, may be found liable if they engage in practices which are unlawful under M.G.L. c. 151B. In particular, M.G.L. c. 151B, §§ 4(4A) and 4(5) provide individual liability where "any person" acts in a way that interferes with the rights secured under Chapter 151B.

Specifically, M.G.L. c. 151B, § 4(4A) prohibits "any person" from interfering "with another person in the exercise of enjoyment of any right granted by this chapter." In addition, M.G.L. c. 151B § 4(5) prohibits "any person, *whether an employer or employee or not*, to aid, incite, compel, coerce the doing of any of the acts forbidden under this chapter or attempt to do so." (emphasis added).

The distinction between the terminology used in M.G.L. c. 151B, § 4(1) ("employer, by himself or his agent") and in Sections 4(4A) and 4(5) ("any person") bears notice. By its distinctly crafted terms, M.G.L. 151B applies not only to employers acting through their principals and agents, but also to any person who aids and abets discriminatory or retaliatory conduct prohibited under Chapter 151B, as well as to any person who interferes with another's right to work free of unlawful discrimination and retaliation.

Accordingly, individual defendants' motions for summary judgment as to plaintiff's retaliation claims brought under both Title VII and M.G.L. c. 151B are denied.

### C. State Common Law Claims

#### 1. Negligent Infliction of Emotional Distress

■ In Count V of her complaint, plaintiff contends that defendants State Street Bank, Spina, Stuart, Johnson and Rice should be held liable for their conduct in tort for negligent infliction of emotional distress. However, on these facts as against these defendants, plaintiff's claims are plainly barred by the exclusivity provision of the Workers' Compensation Act. *See* M.G.L. c.

---

**52.** The Supreme Court has affirmed a basic rule of statutory construction: "In a statutory construction case in the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstances, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 474–76, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

**53.** The First Circuit has yet to rule on this issue. However, in *Scarfo*, the First Circuit affirmed a district court's instructions permitting a finding of individual liability under Title VII. The First Circuit noted the debate among courts and stated that the district court's instructions, therefore, could not be plain error, since the " 'contours of individual liability under' Title VII . . . are currently in a state of evolving definition and uncertainty." *Scarfo*, 54 F.3d at 952.

152, § 26;[54] *Clarke*, 57 F.3d at 27–29; *Catalano v. First Essex Savings Bank*, 37 Mass. App.Ct. 377, 639 N.E.2d 1113, *rev. denied*, 419 Mass. 1101, 644 N.E.2d 225 (1994).

Accordingly, defendants' motion for summary judgment as to this claim is granted.

### 2. *Intentional Infliction of Emotional Distress*

In Count VIII, plaintiff contends not only that defendant Stuart's actions were negligent, but also that his conduct amounted to intentional infliction of emotional distress.

■ Generally, to make out a claim for intentional infliction of emotional distress, the plaintiff must show that: (1) the defendant intended to inflict emotional distress or knew or had reason to know that emotional distress would result from the conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community; (3) the defendant's actions caused the plaintiff's distress; and (4) the plaintiff's distress was severe and of a nature that no reasonable person could be expected to endure it. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–145, 355 N.E.2d 315 (1976).

Stuart argues first that the Workers' Compensation Act bars this claim, and, alternatively, that Ruffino has failed to produce

evidence sufficient to make out the elements of this cause of action.

■ The defendant's arguments both overstate the reach of the Workers' Compensation Act and underestimate Ruffino's evidence. As an initial matter, the Workers' Compensation Act does not shield individual employees from liability for any and all intentionally tortious conduct. *E.g., Bowman v. Heller*, 420 Mass. 517, 651 N.E.2d 369 (1995) (upholding trial court finding of reckless infliction and intentional infliction of emotional distress where the plaintiff was sexually harassed at work by distribution of pornographic images with her name and face); *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72 (1987) (holding that the Workers' Compensation Act does not to bar recovery of damages from the employer for emotional distress resulting from false imprisonment of the plaintiff employee). While some claims are statutorily barred, actions in tort will lie where the employee "commits an intentional tort which was in no way within the scope of employment furthering the interests of the employer." *O'Connell v. Chasdi*, 400 Mass. 686, 690, 511 N.E.2d 349 (1987);[55] *see also, e.g., Anzalone v. Massachusetts Bay Transportation Authority*, 403 Mass. 119, 526 N.E.2d 246 (1988);[56] *Walters v. President*

**54.** Section 26 of the Workers' Compensation Act states, in pertinent part:

If an employee who has not given notice of his claim of common law rights of action under section twenty-four, or who has given such notice and has waived the same, receives a personal injury arising out of and in the course of his employment, or arising out of an ordinary risk of the street while actually engaged, with his employer's authorization, in the business affairs or undertakings of his employer, and whether within or without the commonwealth, he shall be paid compensation by the insurer or self-insurer, as hereinafter provided.

M.G.L. c. 152, § 26.

**55.** In *O'Connell*, a male supervisor, the defendant, during a work-related travel trip, made persistent and escalating physical advances towards the plaintiff. When she resisted his advances, the defendant threatened her ability to do her job and her very position in her workplace. The SJC held that the defendant's actions constituted an intentional tort not within the interests of the employer; as such, he was not immunized from liability by the Workers' Compensation Act. *O'Connell*, 400 Mass. at 690, 511 N.E.2d 349; *see*

*also Catalano*, 37 Mass.App.Ct. at 382, 639 N.E.2d 1113. In *Catalano*, decided after *O'Connell*, the Massachusetts Appeals Court stated that the plaintiff, who alleged a daily campaign of harassment on the part of a company vice president, theoretically could proceed with her claim of intentional infliction of emotional distress. *Id.*

**56.** Although *Anzalone* is cited by the defendants for the proposition that all intentional torts are within the scope of the Workers' Compensation Act, the they are straining to make that case prove too much. The case itself cites to *O'Connell* in order to define the key question. The *Anzalone* Court notes: "The question, then, is whether [the defendant's] actions occurred during the employment relationship; specifically, whether [his] conduct was 'within the scope of employment further the interests of the [employer].'" *Anzalone*, 403 Mass. at 124, 526 N.E.2d 246, citing *O'Connell v. Chasdi*, 400 Mass. at 690, 511 N.E.2d 349. If there were doubt left by *Anzalone*, it has certainly been resolved by *Bowman v. Heller*, 420 Mass. 517, 651 N.E.2d 369 (1995), in which the court not only held that it is possible to advance a claims of intentional and

*and Fellows of Harvard College,* 645 F.Supp. 100, 101 & n. 1 (D.Mass.1986). The SJC has reasoned that "the right to commit such acts [as the sexual harassment found in *O'Connell* ] with impunity was [not] part of the circumstances of employment, unlike liability for negligently injuring others in the course of employment. Such intentional torts are not an accepted risk of doing business." *O'Connell,* 400 Mass. at 690–91, 511 N.E.2d 349.

■■■ Under such circumstances, a plaintiff may recover where a defendant, by extreme and outrageous conduct and without privilege to do so, causes severe emotional distress. *E.g., Bowman v. Heller,* 420 Mass. 517, 651 N.E.2d 369 (1995).

■■■ In this case, Ruffino alleges that Stuart intentionally caused her emotional distress. Among other things, her allegations of persistent, sexually offensive remarks, and her charge of his attempts to discredit her when she pressed her complaint, if credited by a jury, could be found to be conduct Stuart engaged in intending to cause Ruffino emotional distress; that the conduct was both extreme and outrageous; that Stuart's actions caused Ruffino's emotional distress; and that the distress was severe, all sufficient to support a finding of intentional infliction of emotional distress. Accordingly, summary judgment is denied.

### 3. *Interference With Contractual and Advantageous Relations*

In Count VI of her complaint, Ruffino alleges that defendants Spina, Stuart, Johnson, Gregerman and Rice violated the law by intentionally interfering with Ruffino's contractual and advantageous relations with State Street Bank.[57]

reckless infliction of emotional distress, but also that a verdict in favor of the plaintiff on those claims should not be disturbed.

**57.** While theoretically interference with contractual relations is distinguishable from interference with advantageous relations, since only the former requires proof of a contract, in the context of employment Massachusetts law has obscured any meaningful distinction. The focus in either cause of action is interference with the employment relationship.

■■■ Generally, an employee may sue third parties, including managers, supervisors and co-workers, for their tortious interference with his or her employment relationship. The claim of tortious interference with contractual and/or advantageous relations requires a plaintiff to show that: "(1) he had a contract [or advantageous relations] with a third party; (2) the defendant knowingly induced the third party to break that contract [or interfere with the advantageous relations]; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Draghetti v. Chmielewski,* 416 Mass. 808, 816, 626 N.E.2d 862 (1994); *see also McMillan v. Massachusetts Society for the Prevention of Cruelty to Animals,* 880 F.Supp. 900, 910 (D.Mass.1995).

■■■ While under Massachusetts law, a supervisor or manager enjoys a qualified privilege from liability when performing actions within the scope of his or her normal employment duties, *see Boothby v. Texon, Inc.,* 414 Mass. 468, 487, 608 N.E.2d 1028 (1993), the privilege does not shield an employee whose actions are intentional and improper in motive or means. Where the actions of a supervisor are at issue, the plaintiff must prove that the supervisor interfered with the employee's advantageous employment relationship "malevolently, *i.e.,* for a spiteful, malignant purpose, unrelated to the legitimate corporate interest," *Wright v. Shriners Hospital,* 412 Mass. 469, 476, 589 N.E.2d 1241 (1992). That is, the supervisor's actions must rise to the level of " 'actual' malice." *Boothby,* 414 Mass. at 487, 608 N.E.2d 1028.[58]

**58.** While Massachusetts law seems to have rejected the malice standard generally for intentional inference torts, *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812–813, 551 N.E.2d 20 (1990); *see also Dulgarian v. Stone,* 420 Mass. 843, 851–852, 652 N.E.2d 603 (1995), it lingers where the actions of an employer or supervisor are at issue. *Wright v. Shriners Hospital for Crippled Children,* 412 Mass. 469, 476, 589 N.E.2d 1241 (1991).

As courts have repeatedly recognized, this is a question that is consummately fact-bound. *Gram v. Liberty Mutual Ins. Co.*, 384 Mass. 659, 429 N.E.2d 21 (1981); [59] *see also United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 551 N.E.2d 20 (1990); *Comey v. Hill*, 387 Mass. 11, 19, 438 N.E.2d 811 (1982).

Defendants argue for dismissal of this Count. They contend, in the first instance, that defendants' conduct did not cause harm to the plaintiff, since Ruffino resigned voluntarily and none of the defendant employees is responsible for Ruffino's departure from State Street. Alternatively, they argue that plaintiff has alleged no facts which, if credited, could rise to the level of actual malice required to prove her claim for tortious interference with advantageous relations against her supervisors.

I disagree. As to defendant's first point, the interference need not have caused Ruffino's termination. Neither the law nor common sense requires that striking a breach. Surely, an employee can be impermissibly harmed by another's intentional interference with his or her employment relationship where the meddling does not result in a termination. Where, as here, a plaintiff alleges that the continuing support of upper management was, at minimum, irreparably eroded and that she experienced a sharp diminution in status, there are facts sufficient to support this element of her claim. Therefore, plaintiff's cause of action cannot be defeated by defendants' conclusory assertions that Ruffino resigned and was not terminated.

As to defendant Rice, however, Ruffino has not alleged facts sufficient to prove that she maliciously induced a third party to harm Ruffino's employment relationship with the Bank. Ruffino has alleged defendant Rice's inattention to claims of sexual harassment and, even, perhaps her negligent or improper handling of Ruffino's grievances. However, nothing in the record suggests that Rice intentionally set out to cause a rupture in Ruffino's ongoing relationship with the Bank. Accordingly, the claim against Rice is dismissed.

As to the claim against Stuart, Ruffino has alleged sufficient facts to present her case to a jury. Taking all inferences in Ruffino's favor, it could be found that Stuart's efforts to create a hostile environment and then blame her complaints about the same on Ruffino's "difficulties" and "unbalanced" character amount to efforts to induce the Bank, through Spina and Johnson, to harm its employment relationship with Ruffino. Based on the evidence presented, a jury could find improper means or motive, amounting to actual malice. Therefore, Stuart's motion for summary judgment is denied.

With respect to the claim against defendant Gregerman, there exist genuine material facts in dispute. When and whether he set out performance goals, how he determined her progress, his interactions with Johnson in the course of the evaluation Ruffino received in February of 1992: all these facts, when read in a light most favorable to Ruffino, suggest a supervisor who is "papering" the file of a difficult, and formerly valued, employee. It might be that these inferences cannot be sustained; however, at this stage, Ruffino alleges sufficient facts from

---

**59.** The *Gram* court considered supervisory employees' decision to discharge the plaintiff without conducting an investigation. The SJC held that the evidence did not support a finding of malice, stating: "[A]n inference of probability of malice, action motivated by spite, does not reasonably follow from a showing, in these circumstances, only of negligence or of sloppy and unfair business practices." *Id.* at 665, 429 N.E.2d 21.

The court noted: "[M]alice may be shown by the proof of facts from which a reasonable inference of malice may be drawn. The line between a proper inference and unwarranted conjecture is not easily drawn. The answer depends on the evidence in each case.... The fact that there is no direct evidence ... is not dispositive. There might be sufficient proof that spite or ill will was the controlling factor in urging [an adverse action], derived from a 'rational inference of probabilities from established facts,'.... Any reasonable inference of malice must, however, be 'based on probabilities rather than possibilities.' " *Id.* at 664, 429 N.E.2d 21 (citations omitted), cited with approval in *Boothby v. Texon, Inc.*, 414 Mass. 468, 487, 608 N.E.2d 1028 (1993).

which a reasonable jury could find that Gregerman intentionally set out to rupture Ruffino's employment relationship with the Bank, and that he did so maliciously, with improper means or motive. Accordingly, summary judgment as to the claim against Gregerman is denied.

As to the claims against defendants Spina and Johnson, evidence of their conversations with Stuart, the decision-making in which Stuart was involved (prior to any investigation), their dismissal of Ruffino's concerns, and subsequent involvement in Ruffino's evaluation process suffice to permit Ruffino to present her claims in court. Summary judgment is denied, therefore, on Count VI as to defendants Spina and Johnson.

### 4. *Negligent Supervision and Retention*

Count VII or Ruffino's complaint alleges that State Street Bank, Spina and Johnson negligently supervised and retained Stuart by failing to prevent his harassment of and discrimination against Ruffino and then for failing to investigate her reports of such conduct. Defendants answer that any such claim is statutorily barred, either by the Workers' Compensation Act or by the exclusivity provision of Chapter 151B.

I agree with the former argument and need not reach the latter. On the facts of this case, Ruffino's claims are barred by the Workers' Compensation Act. *See* M.G.L. c. 152, § 24 (waiving common law actions for injuries suffered during employment); *see also Clarke,* 57 F.3d at 27–29; *Catalano v. First Essex Savings Bank,* 37 Mass.App.Ct. at 381–82, 639 N.E.2d 1113. Accordingly, summary judgment is granted to defendants as to Count VII.

### 5. *Wrongful Termination*

Count IX of Ruffino's complaint alleges that State Street's demotion of Ruffino, the negative performance review for the year 1991, and the hostile work environment created by State Street amounted to a wrongful constructive discharge. The complaint charges that Ruffino's constructive discharge, "as a solution to the problem of Stuart's sexual harassment and in retaliation for Ruffino's complaints of such harassment ... violated the public policy of this Commonwealth as set forth, *inter alia,* in Mass. Gen.L. c. 214, § 1C, and c. 151B, §§ 1–10."

Defendant State Street Bank does not agree, responding that State Street Bank did not terminate Ruffino's employment, and that her claim, in any case, is preempted by the both the existence and exclusivity of M.G.L. c. 151B.

Defendant has the better argument. Even assuming, arguendo, that Ruffino could prove constructive discharge, her common law wrongful termination claim nevertheless must fail. A cause of action for wrongful termination has been recognized in a defined set of circumstances, including where a termination violated a clearly established public policy. *E.g., King v. Driscoll,* 418 Mass. 576, 581–82, 638 N.E.2d 488 (1994). This public policy exception to the Massachusetts at-will employment doctrine is a narrow one. Where, as here, the public policy is articulated in a "comprehensive remedial statute," *Melley v. Gillette Corp.,* 19 Mass.App.Ct. 511, 512–13, 475 N.E.2d 1227 (1985), *aff'd* 397 Mass. 1004, 491 N.E.2d 252 (1986), and recognition of the claim would lead to the creation of a new common law action "based on the public policy expressed in that statute [and interfering] ... with that remedial scheme," *id.,* the common law claim will not be allowed. *See Bergeson v. Franchi,* 783 F.Supp. 713, 718 (D.Mass.1992) (common law wrongful discharge claim dismissed where grounded in public policy prohibiting sexual harassment, as defined by and articulated in M.G.L. c. 151B and court decisions thereunder).

Plaintiff has suggested no established public policy that would not find its root in the remedial statute set forth in Chapter 151B. Accordingly, this claim must be dismissed.

### 6. *Breach of Duty of Good Faith and Fair Dealing*

Plaintiff further seeks redress for defendant State Street Bank's conduct by alleging that State Street Bank breached its duty of good faith and fair dealing. Ruffino intones the general principle of Massachusetts law that, "parties to contracts and commercial transactions must act in good faith toward one another." *Fortune v. National Cash*

*Register Co.,* 373 Mass. 96, 102, 364 N.E.2d 1251 (1977); *see also Grubba v. Bay State Abrasives, Division of Dresser Industries, Inc.,* 803 F.2d 746, 747 (1st Cir.1986).

Massachusetts has long recognized an implied covenant of good faith and fair dealings and claims for a breach of that covenant are cognizable when an employer's reasons for taking an adverse employment action are contrary to public policy. For instance, where evidence suggests that an employer terminated an employment relationship to avoid paying a commission, the SJC has held that the employers actions might have violated established public policy and determined that the question of bad faith properly should go before the jury. *Id.* at 103, 364 N.E.2d 1251; *see also RLM Assocs. v. Carter Mfg. Corp.,* 356 Mass. 718, 248 N.E.2d 646 (1969).

 However, the court's recognition of this cause of action is limited to situations in which there is no other adequate way to vindicate established public policy. *See, e.g., Melley,* 19 Mass.App.Ct. at 512–13, 475 N.E.2d 1227; *Grubba,* 803 F.2d at 747; *Crews v. Memorex Corp.,* 588 F.Supp. 27 (D.Mass.1984). Clearly that is not the case here. Although Ruffino argues that State Street Bank violated public policy and thereby breached its duty of good faith and fair dealing, Ruffino has herself cited a panoply of laws under which she seeks redress for her employer's alleged wrongdoing. The available statutory remedies provide adequate means of vindicating her rights. Accordingly, summary judgment in favor of the defendant shall be granted as to Count X.

## V. CONCLUSION

For the forgoing reasons, I conclude that defendants' motions for summary judgment shall be **ALLOWED IN PART AND DENIED IN PART.** As to each claim, I rule as follows:

1. With respect to plaintiff's claims of sexual harassment against all defendants, under M.G.L. c. 151B (Count I); M.G.L. c. 214, § 1C (Count II), M.G.L. c. 93, § 102 (Count IV) and 42 U.S.C. § 2000e et seq. (Count III), defendants' motions for summary judgment are **ALLOWED.** Accordingly, Count I is **DISMISSED IN PART,** Count II is **DISMISSED,** Count III is **DISMISSED IN PART,** and Count IV is **DISMISSED.**

2. With respect to plaintiff's retaliation claims, under M.G.L. c. 151B (Count I) and 42 U.S.C. § 2000e et. seq. (Count III), I **DENY** summary judgment in favor of the defendants.

3. As to Count V, charging negligent infliction of emotional distress as against defendants State Street Bank, Spina, Stuart, Johnson and Rice, defendants' motions for summary judgment are **ALLOWED,** and Count V is accordingly **DISMISSED.**

4. As to Count VI (interference with contractual and/or advantageous relations), I **DENY** summary judgment as to claims against defendants Spina, Stuart, Johnson and Gregerman. However, defendant Rice's motion for summary judgment is **ALLOWED,** and Count VI against defendant Rice is accordingly **DISMISSED.**

5. With respect to Count VII for negligent supervision and retention against defendants State Street Bank, Spina and Johnson, defendants' motions for summary judgment are **ALLOWED,** and Count VII is accordingly **DISMISSED.**

6. Count VIII for intentional or reckless infliction of emotional distress against defendant Stuart, I **DENY** summary judgment.

7. As Count IX for wrongful termination against State Street Bank, defendant's motion for summary judgment is **ALLOWED,** and Count IX is accordingly **DISMISSED.**

8. As to Count X for the breach of the implied covenant of good faith and fair dealing against State Street Bank, I **ALLOW** defendant's motion for summary judgment. Accordingly, Count X is **DISMISSED.**

**SO ORDERED.**